UNITED STATES of America, Appellee,

v.

Ahmed AMER, Defendant–Appellant.

No. 298, Docket 96–1181.

United States Court of Appeals,
Second Circuit.

Argued Oct. 16, 1996.

Decided March 26, 1997.

Henry H. Rossbacher, Los Angeles, CA (Tracy W. Young, Rossbacher & Associates, Los Angeles, CA; Harry C. Batchelder, Jr., New York City, on the brief), for defendant–appellant.

Timothy Macht, Asst. U.S. Atty., Brooklyn, N.Y. (Zachary W. Carter, U.S. Atty., Peter A. Norling, Asst. U.S. Atty., Brooklyn, N.Y., on the brief), for appellee.

Before: NEWMAN, Chief Judge, CARDAMONE and McLAUGHLIN, Circuit Judges.

JON O. NEWMAN, Chief Judge:

This appeal concerns several issues arising from a conviction for violation of the International Parental Kidnapping Crime Act ("IPKCA" or "the Act"), 18 U.S.C. § 1204. The IPKCA bars a parent from removing a child from the United States or retaining outside the United States a child who has been in the United States, with the intent to obstruct the other parent's right to physical custody. We have not previously considered this statute. The specific questions raised are (i) whether the IPKCA is unconstitutionally vague, (ii) whether it is overbroad in intruding upon the free exercise of religion, (iii) whether it incorporates the affirmative defenses found in the Hague Convention on the Civil Aspects of International Parental Child Abduction ("Hague Convention"), (iv) whether the sentencing court properly imposed, as a condition of the convicted defendant's term of supervised release, a requirement that the defendant return the still-retained children to the United States, and (v) whether the sentencing court properly applied a three-level enhancement for substantial interference with the administration of justice.

These issues of first impression arise on an appeal by Ahmed Amer from the March 14, 1996, judgment of the District Court for the Eastern District of New York (Carol Bagley Amon, Judge), convicting him, after a jury trial, of one count of international parental kidnapping in violation of the IPKCA and sentencing him to twenty-four months' imprisonment and a one-year term of supervised release with the special condition that he effect the return of the abducted children to the United States. We affirm.

## Background

Ahmed Amer ("Ahmed") and Mona Amer ("Mona"), Egyptian citizens and adherents of the Islamic faith, were married in Egypt in 1980. Four years later, while still in Egypt, Mona gave birth to the couple's first child, a boy named Amachmud. In 1985, Ahmed, seeking employment, left his wife and new-born son in Egypt and moved to the United States. Ahmed eventually settled in Queens, New York.

In 1987, Mona and Amachmud joined Ahmed in Queens. Mona stayed home to take care of the child while Ahmed worked as a cook in various diners in the city. In 1989, the couple had another child, a girl named Maha. In 1991, the couple's third child, a son named Omar, was born.

The two children born in the United States, Maha and Omar, became American citizens upon their birth. In 1991, Ahmed became a naturalized United States citizen, though he continued to retain his Egyptian citizenship. Mona obtained permanent resident alien status in this country the following year. Also in 1992, the entire Amer family returned to Egypt for a one-month visit, which was the only time that anyone in the family returned to Egypt prior to the episode on which the indictment is based.

During the early 1990s, the Amers' marriage began to deteriorate. Ahmed and Mona quarreled frequently over Ahmed's bigamous marriage to another woman, Mona's decision to work outside the home, and her decision to apply for welfare. Ahmed regularly abused Mona both verbally and physically. In April 1994, Mona asked Ahmed to leave the family apartment. He obliged and moved into a friend's apartment. The couple did not, however, divorce or become legally separated. The three children remained with Mona at the Queens home. No formal custody arrangement was made. Ahmed visited the children whenever he wished, usually once each week. During this period, Mona supported herself with public assistance and loans from friends.

Although he was no longer living in the family home, Ahmed continued to abuse Mona when he saw her. He also began to try to persuade her to move back to Egypt with him, suggesting that the children would receive a better education there and that the family would benefit from living among close relatives. Although Mona at one point appeared to agree, she eventually told Ahmed that neither she nor the children would return to Egypt. Ahmed threatened to kill Mona for her refusal, but she would not

agree to leave the United States or to allow him to take the children from this country.

On January 27, 1995, Ahmed came to the family apartment in Queens to have dinner with Mona and the children. After dinner, Mona left the house to do some shopping. When she returned two hours later, Ahmed and the children were gone. The next morning Mona learned that Ahmed had taken the children to Egypt. Mona has not seen her children since that time.

Records from Egypt Air showed that on the evening of January 27th, Ahmed and the three children boarded a flight from JFK Airport to Egypt. After arriving in Egypt, Ahmed took the children to his mother's home, which is about ten minutes from the home of Mona's parents. The children visited with Mona's parents a few days after their arrival in Egypt. Amachmud, Maha, and Omar continue to reside in Egypt with Ahmed's mother.

In February 1995, Mona filed a complaint in Queens Family Court seeking custody of the children. The court awarded her full legal custody of the three children and issued a warrant for Ahmed's arrest. At around the same time, Ahmed obtained an order from an Egyptian court compelling Mona to return to the "conjugal home" in Egypt. After Mona failed to return to Egypt within three months, the Egyptian court in May 1995 awarded Ahmed custody of the three children. Additionally, Mona no longer has custody rights to twelve-year-old Amachmud under Egyptian law, which provides that a mother loses all rights to her male child when he reaches the age of ten.

In June 1995 Ahmed left the children in his mother's care and returned to the United States. He was apprehended the following month in New Jersey. The eventual indictment, issued in the Eastern District of New York, charged that "[o]n or about and between January 27, 1995 and August 4, 1995, . . . the defendant Ahmed Amer did knowingly and intentionally remove and retain children who had been in the United States, to wit [Amachmud] Amer, Maha Amer and Omar Amer, outside the United States with the intent to obstruct the lawful exercise of parental rights," in violation of the IPKCA.

Ahmed was convicted by a jury on the sole count of the indictment. Judge Amon imposed a sentence of twenty-four months' imprisonment and a one-year term of supervised release, with the special condition that Ahmed effect the return of the three children to the United States. At the time of this appeal, the children remain in Egypt.

### Discussion

The IPKCA was enacted in December 1993, but has apparently been sparingly used. We have found no published decision of a federal court construing this statute. The IPKCA provides, in relevant part:

(a) Whoever removes a child from the United States or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both.

(b) As used in this section—

(1) the term "child" means a person who has not attained the age of 16 years; and

(2) the term "parental rights", with respect to a child, means the right to physical custody of the child—

(A) whether joint or sole (and includes visiting rights); and

(B) whether arising by operation of law, court order, or legally binding agreement of the parties.

18 U.S.C. § 1204. Ahmed raises two constitutional challenges to the Act: that it is vague and also overbroad in its intrusion upon free exercise rights. He also contends that the District Court erred in not allowing him to present certain "affirmative defenses" found in the Hague Convention during the trial, in imposing a special condition of his term of supervised release, and in enhancing his offense level. We discuss each contention in turn.

### I. Vagueness

Ahmed contends that three aspects of the Act render it void for vagueness by failing to give a "person of ordinary intelligence a reasonable opportunity to know what is

prohibited" under the Act. *See Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). First, he asserts that the term "retains," 18 U.S.C. § 1204(a), is vague because the Act does not define the duration or length of time that a child must be "retain[ed]" outside the United States in order to constitute a violation of the IPCKA. Second, he contends that the parenthetical phrase "( [child] who has been in the United States)," *id.*, is vague because the IPKCA does not specify the length of time that a child must have been in the United States before the IPKCA will be triggered by the child's removal or retention. Third, he argues that the phrase "lawful exercise of parental rights," *id.*, is vague because the Act does not provide any guidance as to whether parental rights are to be defined by state law, federal law, Egyptian law, customary international law, or "positive law promulgated by the United Nations."

The "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). To succeed, however, the proponent of the vagueness argument "must demonstrate that the law is impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). Specifically, a challenger "who engages in some conduct that is clearly proscribed [by the challenged statute] cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 495, 102 S.Ct. at 1191; *see Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2561–62, 41 L.Ed.2d 439 (1974); *Brache v. County of Westchester*, 658 F.2d 47, 51 (2d Cir.1981); Laurence H. Tribe, *American Constitutional Law* § 12–31 at 1034 (2d ed.1988).

This limiting principle defeats Ahmed's vagueness challenge. Even if the term "retains" or the phrase "has been in the United States" might reflect some uncertainty as applied to extreme situations, the conduct for which Ahmed was prosecuted and convicted falls squarely within the core of the IPKCA. First, although it might be debatable whether a two- or three-day retention outside the United States would be sufficient to trigger the Act, there can be no doubt that Ahmed's retention of the three children from January 27, 1995, to August 4, 1995, the period set out in the indictment, was covered by the Act. Second, although there might be room for argument as to whether foreign children who were merely visiting the United States on a week-long vacation would be protected by the Act, no issue arises as to the duration of the stay of the three Amer children in the United States. The eldest child had resided in New York since leaving Egypt in 1987, and the other two children were born in New York in, respectively, 1989 and 1991, and have resided in the United States for their entire lives.

Finally, Ahmed's argument as to the clarity of the phrase "parental rights" fails because Congress made clear in the legislative history of the Act that " 'parental rights' are to be determined by reference to State law, in accordance with the Hague Convention...." H.R.Rep. No. 103–390, at 4 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2419, 2422 ("House Report"). Article 3 of the Hague Convention provides that parental rights are to be defined by "the law of the State in which the child was habitually resident immediately before the removal or retention." Art. 3(a), Hague Convention, *opened for signature* Oct. 25, 1980, 19 I.L.M. 1501, T.I.A.S. No. 11670 (1980) (entered into force for the United States, July 1, 1988); *see* Merritt L. McKeon, *International Parental Kidnapping: A New Law, a New Solution*, 30 Fam. L.Q. 235, 240 (1996). Although the concept of the state of "habitual residence" might be unclear at the margins, there is no doubt that, in this case, New York is that place. At the time of their abduction, Amachmud had resided in New York for eight years, and Maha and Omar had lived in New York since their birth. Moreover, there is no confusion under New York law that Mona, as the biological mother, enjoys the right to physical custody of her children unless and until this right is terminated by law. *See, e.g., In re*

*Michael B.,* 80 N.Y.2d 299, 308–09, 590 N.Y.S.2d 60, 604 N.E.2d 122, 127–28 (1992).

Ahmed's act of removing long-term residents of the United States and retaining them for more than six months in Egypt in order to frustrate their mother's lawful exercise of her right to physical custody under New York law falls squarely within the coverage of the IPKCA. Because "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness," *Parker,* 417 U.S. at 756, 94 S.Ct. at 2562, Ahmed's first argument cannot succeed.

## II. Overbreadth/Free Exercise

■ Ahmed next contends that the IPKCA must be invalidated because it punishes parents for engaging in the constitutionally protected act of returning their children to the land of the parents' birth for religious reasons. Although Ahmed styles this an "overbreadth" argument, his real point is that the IPKCA infringes on the free exercise of religion by proscribing removals of children from the United States even when those acts are dictated, or at least motivated, by "religious law." Ahmed contends that he returned his children to Egypt in order to provide them with a proper Muslim upbringing, and that punishing him for this act violates his rights under the Free Exercise Clause.

This argument was not raised until this appeal and is hence forfeited. *See, e.g., United States v. Papadakis,* 802 F.2d 618, 621 (2d Cir.1986). At no point during the pretrial, trial, or sentencing proceedings did Ahmed argue that his act of removing and retaining the children was religiously mandated or inspired. The only explanations that the defense proffered to justify Ahmed's

conduct were that (i) Mona was neglecting the children, (ii) the children would be "better taken care of in Egypt," (iii) Ahmed had "finished [his business] in [the United States] and ... wish[ed] to settle in [his] own Nation among [his] family and relatives," and (iv) "the schools over there were better." Because Ahmed failed to bring to the District Court's attention the claim that his taking the children to Egypt was religiously motivated, thereby precluding the Government the opportunity of disputing such a claim factually, he has forfeited his free exercise challenge.

■ Moreover, there is no plain error, *see* Fed.R.Crim.P. 52(b), even under the somewhat less stringent version of plain-error analysis applicable to alleged "errors of constitutional magnitude." *See United States v. Torres,* 901 F.2d 205, 228 (2d Cir. 1990) (quotations and citation omitted). A neutral law of general applicability does not violate the Free Exercise Clause simply because the law imposes an incidental burden on a religious practice. *Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 878–79, 110 S.Ct. 1595, 1599–1600, 108 L.Ed.2d 876 (1990). The IPKCA punishes conduct within its reach without regard to whether the conduct was religiously motivated. Because Ahmed does not even allege that the IPKCA targets religious beliefs or was designed to prohibit parental kidnappings motivated by the parents' religious concerns, *see Church of the Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 545–46, 113 S.Ct. 2217, 2233–34, 124 L.Ed.2d 472 (1993), and because the Act punishes parental kidnappings solely for the harm they cause, it does not violate the Free Exercise Clause.[1]

---

**1.** Ahmed also raises the possibility that the IPKCA violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb–4, by proscribing religiously motivated removals and retentions of children. Because this argument was not raised in the District Court, it too is forfeited. In any event, Ahmed fails to meet the threshold requirement of an RFRA claim. He cannot show that the IPKCA "substantially burden[s]" a religious practice. *Cf. Cheffer v. Reno,* 55 F.3d 1517, 1522 (11th Cir.1995). Even if we assume, for the sake of argument, that Ahmed in fact removed the children to Egypt in

order to provide them with a religious education, there is nothing in the record to suggest that the children could not receive proper training in the tenets of Islam in the United States, or that they must go to Egypt to become religiously educated Muslims. Moreover, the IPKCA does not generally prohibit relocation of children or even make it significantly more difficult to do so. It simply prohibits relocation in one very narrow circumstance, where to do so would violate the custodial rights of the other parent. The IPKCA does not "put substantial pressure on an adherent to modify his behavior and to violate his beliefs."

### III. Incorporation of Hague Convention Defenses

Ahmed contends that the District Court erred when it refused to permit him to argue in his defense that he was justified in removing and retaining the children in Egypt under the Hague Convention. The Convention, he asserts, affords him a defense where "there is a grave risk that [the children's] return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." This risk, he argues, arises from Mona's allegedly neglectful care. Ahmed also contends that the Hague Convention allows him to argue in his defense that the children's return would not be "permitted by the fundamental principles of [Egyptian law] relating to the protection of human rights and fundamental freedoms," which allegedly do not permit Muslim children to be denied their right to an Islamic upbringing. Hague Convention, Arts. 13(b) & 20.[2] The District Court denied Ahmed's request because it found that the three affirmative defenses specifically set forth in section 1204(c) of the Act are the only ones available to a defendant facing an IPKCA prosecution:

(c) It shall be an affirmative defense under this section that—

(1) the defendant acted within the provisions of a valid court order granting the defendant legal custody or visitation rights and that order was obtained pursuant to the Uniform Child Custody Jurisdiction Act and was in effect at the time of the offense; ·

(2) the defendant was fleeing an incidence or pattern of domestic violence;

(3) the defendant had physical custody of the child pursuant to a court order granting legal custody or visitation rights

and failed to return the child as a result of circumstances beyond the defendant's control, and the defendant notified or made reasonable attempts to notify the other parent or lawful custodian of the child of such circumstances within 24 hours after the visitation period had expired and returned the child as soon as possible.

18 U.S.C. § 1204(c). Since Ahmed did not qualify under any of these subsections, the Court ruled that he could not argue that he was justified in removing and retaining the children because, among other things, Mona was a poor parent or because Egyptian human rights laws protected the right of Islamic children to a proper religious education.

Ahmed argues that the District Court's construction conflicts with section 1204(d), which provides that the Act "does not *detract from* The Hague Convention." *Id.* § 1204(d) (emphasis added). As he reads the emphasized language, the IPKCA must be construed to incorporate all the defenses available in the Hague Convention because, otherwise, the Act would "detract from" the Convention. His point is that since the *requested state* in a Hague Convention proceeding can decline the "left-behind" parent's request that the children be returned if the return would "expose the child[ren] to physical or psychological harm," "place the child[ren] in an intolerable situation", or result in the denial of their religious freedoms, an *abducting parent* prosecuted under the IPKCA must be allowed to present these same defenses if the Act is not to "detract from" the Convention.

We note, as an initial matter of statutory construction, that the IPKCA's explicit listing of three, and only three, affirmative defenses is a strong indication that the defenses arguably inferred from the Hague

---

*Thomas v. Review Board of the Indiana Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981).

**2.** Other justifications for the removal and continued retention of abducted children available under the Hague Convention include: (1) where the abducting parent can establish that the child was removed over one year ago and is now "settled in its new environment," Art. 12; (2) where the abducting parent can establish that the "left-behind" parent is either not acting under a right

of custody or gave consent to the abducting parent to remove or retain the child, Art. 13(a); and (3) where the abducted child "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views," Art. 13. *See generally* Lynda R. Herring, Comment, *Taking Away the Pawns: International Parental Abduction & the Hague Convention,* 20 N.C. J. Int'l L. & Com. Reg. 137, 149–50 (1994).

Convention are not available in an IPKCA prosecution, at least in the absence of a clear indication that the Convention makes such defenses available. In any event, our examination of the relationship between the Hague Convention and the IPKCA reveals that, at least in this case, refusing to allow Ahmed to present Hague Convention defenses not found in the IPKCA would not in any way "detract from" the Convention.

The Hague Convention, which was drafted in 1980 and, as of May 1995, had been ratified by forty-one nations, *see* Antoinette Passanante, Note, *International Parental Kidnapping: The Call for an Increased Federal Response,* 34 Colum. J. Transnat'l L. 677, 692 & n. 90 (1996), was adopted in order "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, preamble. It created a previously unavailable civil remedy for the return of abducted children, whereby the left-behind parent can request the designated "Central Authority" of the state in which the abducted child is retained to locate the child, institute proceedings to effect its return, assist in administrative technicalities, and generally aid in the amicable resolution of the kidnapping situation. Hague Convention, Arts. 6 to 9.[3] *See generally* Susan L. Barone, *International Parental Child Abduction: A Global Dilemma with Limited Relief—Can Something More Be Done?,* 8 N.Y. Int'l L.Rev. 95, 100–13 (1995); Lynda R. Herring, Comment, *Taking Away the Pawns: International Parental Abduction & the Hague Convention,* 20 N.C. J. Int'l L. & Com. Reg. 137 (1994). The Convention also provides that the respective Central Authorities of the state of habitual residence (*i.e.,* the state from which the children have been removed) and the state to which the children have been taken and retained "shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children." Hague Convention, Art. 7.

The Convention includes no criminal punishment for the abducting parent, nor does it provide for the resolution of the underlying custody dispute. Its sole objective is to "restore the factual situation that existed prior to a child's removal or retention." Herring, *supra,* at 147; *see* Hague Convention, Art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). The United States became a party to the Convention on July 1, 1988, *see* Exec. Order No. 12,648, 53 Fed.Reg. 30,637 (1988), and Congress subsequently enacted the International Child Abduction Remedies Act, 42 U.S.C. §§ 11601–11610, to implement the Convention. The designated Central Authority in the United States is the Department of State. 53 Fed.Reg. at 30,637.

The Hague Convention's mechanisms are triggered, however, only when both the country to which the child is abducted and the country from which they are taken are parties to the Convention. As Article 35 plainly states, "This Convention shall apply as between Contracting States...." *See also* Hague Convention, Art. 1 (object of Convention is to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States"). This requirement that both the "left-behind" and the "retaining" countries are signatories to the Convention is also implicit in its very operation. Because the Convention functions solely through the designated Central Authorities in the respective states, and because only contracting parties will have designated such authorities, the Convention can operate only between two signatory states. *See id.,* Arts. 6 & 7; *Mezo v. Elmergawi,* 855 F.Supp. 59, 62 (E.D.N.Y. 1994); *Mohsen v. Mohsen,* 715 F.Supp. 1063, 1065 (D.Wyo.1989).

Because the Convention does not apply when children habitually resident in the United States (and who are often American

---

**3.** The left-behind parent can also petition the designated Central Authority in the state of the child's habitual residence to aid the parent in seeking the return of the child from the state to which it has been abducted. Hague Convention, Arts. 8 & 9; *see generally Mezo v. Elmergawi,* 855 F.Supp. 59 (E.D.N.Y.1994).

citizens) are abducted from this country and retained in a non-contracting country, the perception arose that something was needed to deter parents from removing and retaining their children in these "safe haven" countries, and thus to close the gap left open by the unfortunate fact that few countries have signed on to the Convention. As the IPKCA's legislative history shows, it was against this backdrop that the Act was enacted:

> There is an international civil mechanism relating to these cases, the Hague Convention ..., for which Congress passed implementing legislation in 1988. As a result of this convention, the signatories will recognize the custody decrees of other signatories, thereby facilitating the return of abducted children. *However, most countries are not signatories to the Convention, thus leaving individual countries to take whatever legal unilateral action they can to obtain the return of abducted children.*
>
> *Creating a federal felony offense responds to these problems* . . . .

House Report at 3, 1993 U.S.C.C.A.N. at 2421 (emphasis added). Nonetheless, Congress continued to believe that the civil mechanism of the Hague Convention, when available, was the preferred route for resolving the complex and difficult problems surrounding international child abductions. It thus provided a "Sense of Congress" resolution to accompany the Act:

> It is the sense of the Congress that, inasmuch as use of the procedures under the Hague Convention ... has resulted in the return of many children, *those procedures, in circumstances in which they are applicable, should be the option of first choice* for a parent who seeks the return of a child who has been removed from the parent.

Pub.L. No. 103–173, § 2(b), 107 Stat.1998 (1993) (emphasis added); *see* Statement by President Clinton upon Signing [the IPKCA], 29 Weekly Comp. Pres. Doc. 2493 (Dec. 6, 1993), *reprinted in* 1993 U.S.C.C.A.N. at 2424–1 ("[The Act] reflects the Congress' awareness that the Hague Convention has resulted in the return of many children and the Congress' desire to ensure that the creation of a Federal child abduction felony

offense does not and should not interfere with the Convention's continued successful operation.... [The Act] should be read and used in a manner consistent with the Congress' strong expressed preference for resolving these difficult cases, if at all possible, through civil remedies."). In that spirit, section 1204(d) of the IPKCA provides that the Act "does not detract from the Hague Convention." 18 U.S.C. § 1204(d).

■ Construing the IPKCA against this background, we conclude that rejecting Hague Convention defenses in Ahmed's prosecution does not "detract from" the Convention. In the first place, Egypt, the country to which the Amer children have been removed and in which they are currently being retained, is not a signatory to the Convention. *See* Passanante, *supra,* at 692 n. 90 (listing parties to Convention); *Mezo,* 855 F.Supp. at 61 ("[N]either Egypt nor Libya are signatories to the Hague Convention and are therefore not bound by its requirements."). Second, because the civil mechanism of the Convention is therefore unavailable to Mona to effect the return of her children, the United States' criminal prosecution of Ahmed for the abduction and retention of the children under the IPKCA cannot in any way "detract from" the Hague Convention within the meaning of section 1204(d), and, indeed, perfectly fulfills the "enforcement-gap-closing" function for which the IPKCA was partially enacted. Although it ·might be a close question ·whether a defendant should be permitted to raise Hague Convention defenses when, for instance, there is a parallel or ongoing civil proceeding under the Convention and its implementing legislation, we do not need to decide that question in this case. The District Court acted properly in restricting Ahmed to the three available affirmative defenses found in section 1204(c) of the Act.

## IV. Special Condition of Supervised Release

Ahmed next objects to the District Court's imposition of the following special condition of supervised release: "[T]he defendant [must] effect the return of the children to the United States to Mona Amer." He contends that (a) the District Court exceeded

its authority under the Sentencing Guidelines provisions concerning appropriate conditions of supervised release, (b) this condition is inconsistent with the Sentencing Commission's intent that the abducting parent not be punished for the length or duration of his retention of the children, (c) reimprisonment following a violation of the condition would constitute double jeopardy, (d) the condition is impossible to meet, and (e) the condition violates the Egyptian court order granting Ahmed custody over the children. We discuss each objection in turn.[4]

■■■■ (a) *Guidelines limitations.* Ahmed contends that the "return" condition exceeds the sentencing court's authority under 18 U.S.C. § 3583 and U.S.S.G. § 5D1.3(b). Although sentencing courts have "broad discretion to tailor conditions of supervised release to the goals and purposes outlined in § 5D1.3(b)," this provision does not provide sentencing courts with "untrammelled discretion" in this regard. *United States v. Abrar*, 58 F.3d 43, 46–47 (2d Cir. 1995). Specifically, section 5D1.3(b) provides:

> The court may impose other conditions of supervised release, to the extent that such conditions are reasonably related to (1) the nature and circumstances of the offense and the history and characteristics of the defendant, and (2) the need for the sentence imposed to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*See* 18 U.S.C. §§ 3553(a)(2) and 3583(d). This Circuit has ruled that "despite the continuous use of the ... conjunctive 'and' in § 5D1.3(b), taking into account the authorizing statutes, a condition may be imposed if it is reasonably related to any one or more of the specified factors." *Abrar*, 58 F.3d at 46.

The "return" condition is obviously closely related to "the nature and circumstances of the offense" of child abduction and "the history and characteristics" of Ahmed. Indeed,

it is difficult to imagine a condition more closely tailored to the crime and the criminal in question than this one. Moreover, the requirement that Ahmed return the children serves the goal of general deterrence. As the District Court put it,

> It seems that often in cases such as this, a vindictive parent may be willing to possibly face a modest prison term in order to keep the children from the spouse. But if the parent recognizes that the Court has a legal mechanism to additionally order the return of the children, then recognizing that may well serve as an additional deterrent.

The condition also serves the function of specific deterrence. It deters Ahmed both from committing the offense of the unlawful retention of the children in Egypt after his release from prison, and from attempting to kidnap his children again after they have been returned to the United States.

■■■■ (b) *Punishment for extent of retention.* Ahmed contends that the special condition essentially punishes him for the length or duration of his retention of the children because someone who retained abducted children for only a short period would not face this condition. He argues that this allegedly length-based "enhancement" is inconsistent with the Sentencing Commission's intent, and points to an analogous provision of the Guidelines—section 2A4.1 governing non-parental kidnapping offenses prosecuted under, among other statutes, 18 U.S.C. § 1201—as support. In that guideline, there is a specific offense characteristic that enhances a kidnapper's sentence based on the length of time that he held the victim. U.S.S.G. § 2A4.1(b)(4)(A)-(B) (increasing offense level by two if victim not released within thirty days and by one if victim not released within seven days). Ahmed argues that the absence of a comparable specific offense enhancement in the guideline governing IPKCA offenses, section 2J1.2, means that the sentencing court cannot impose any "penalties," even under the guise of a special condition of supervised release, upon a defendant based

---

4. We note that the IPKCA itself does not expressly specify what should be done when a defendant refuses to return the abducted children to this country. *See* Passanante, *supra,* at 694.

on the duration of his retention of the victims.

Even if the absence of a specific offense enhancement for length of retention under the IPKCA guideline somehow implies that this factor cannot be used to "enhance" a defendant's sentence, which is doubtful, Ahmed's argument fails because the special condition is not based on the *duration* of the retention, but on the fact of his *continued* retention of the children. Regardless of how long Ahmed has held the children in Egypt, the special condition requires him to return the children if the retention continues during the term of supervised release. This condition is therefore not inconsistent with the Sentencing Commission's alleged intent not to penalize an IPKCA offender based on the duration of the retention.

■■■■■ (c) *Double jeopardy.* Ahmed argues that further imprisonment for failing to abide by this special condition, *i.e.*, revoking his supervised release if he refuses to return the children after his release from prison, would violate the Double Jeopardy Clause by exposing him to multiple punishments for the same offense for which he was convicted. Even if this objection is ripe, which we do not think it is, no double jeopardy violation will occur if Ahmed is subsequently re-imprisoned for violating the special condition. Ahmed fails to realize that "the entire sentence, including the period of supervised release, is the punishment for the original crime, and 'it is the original sentence that is executed when the defendant is returned to prison after a violation of the terms' of his release." *United States v. Soto–Olivas,* 44 F.3d 788, 790 (9th Cir.1995) (citation omitted). Because revocation of supervised release for the violation of a condition of release is "not new punishment for a new crime," *id.* at 792, but "part of the whole matrix of punishment which arises out of a defendant's original crime[ ]," *United States v. Paskow,* 11 F.3d 873, 883 (9th Cir.1993), double jeopardy protection would be not violated if and when Ahmed's term of supervised release is revoked for his failure to return the children to the United States.[5]

■■■■■ (d) *Impossibility.* Ahmed contends that the special condition is unfair and would be impossible for him to meet because (i) he cannot arrange for the return of the children while he is in prison, and (ii) he will be in violation of the condition as soon as he is released from prison in March 1998 (excluding good-time credit). This objection is premature, and need not be considered at this time. Any potential unfairness to Ahmed arising from an attempt to revoke his term of supervised release immediately upon his release from prison can be evaluated if and when such revocation occurs. In any event, the District Judge has already indicated her willingness to provide Ahmed with a reasonable period of time following his release from prison to effect the return of the children, and the Judge has authority under 18 U.S.C. § 3583(e) to modify or revoke the conditions and term of supervised release to account for any unforeseen or changed circumstances. *See United States v. Lussier,* 104 F.3d 32, 36 (2d Cir.1997).

■■■■ (e) *Conflict with Egyptian order.* Ahmed argues that the special condition conflicts with an Egyptian court's May 1995 order granting Ahmed custody over the

5. This Circuit has also ruled that "because a revocation proceeding is 'not a proceeding designed to punish a criminal defendant for violation of a criminal law,' the defendant may be both punished for the supervised-release violation and prosecuted criminally for the same conduct without implicating principles of double jeopardy." *United States v. Meeks,* 25 F.3d 1117, 1122 (2d Cir.1994) (citation omitted); *see also United States v. Grisanti,* 4 F.3d 173, 176 (2d Cir.1993) (jeopardy does not attach during parole, probation, or bail revocation hearings).

Moreover, we note that the key assumption underlying this objection—that Ahmed's continued retention of the children following his release from prison would constitute the "same" offense for which he was convicted—is highly questionable. The indictment charged Ahmed with removing and retaining the children during the period "from January 27, 1995 to August 4, 1995." Because the IPKCA punishes both "removals" *and* "retentions," and because Ahmed has not been punished for his act of retaining the children after August 4, 1995, even a subsequent criminal prosecution for this new offense—the wrongful retention of children, who have been in the United States, outside the United States from August 4, 1995 to the present—may be permitted under the Double Jeopardy Clause.

Amer children. This objection misconstrues the force and nature of the condition requiring Ahmed to return the children to the United States. Similar to the IPKCA, and indeed the Hague Convention, the District Court's command that Ahmed return the children does not seek to settle any underlying custody dispute that might exist between Mona and Ahmed, but merely attempts to restore the status quo prior to Ahmed's criminal removal and retention of the children, and thus to deny him the "legal advantage [he gained] from the abduction to or retention in the country where the child[ren] [are] located." Herring, *supra*, at 147. Whatever arguable conflict with his claimed rights under the Egyptian custody order might arise from requiring return of the children to the United States cannot validly be asserted by Ahmed inasmuch as he brought the children to Egypt (and thereby obtained his claimed Egyptian custody rights) in violation of United States law.

## V. Substantial Interference with Administration of Justice

■ Finally, Ahmed argues that the District Court erred in imposing a three-level enhancement under section 2J1.2(b)(2) for "substantial interference with the administration of justice." Application Note 1 to this guideline states:

"Substantial interference with the administration of justice" *includes* a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. § 2J1.2, comment. (n.1) (emphasis added). Ahmed reads this Note as providing an exhaustive list of acts constituting "substantial interference," and contends that because he has done nothing that falls within the specified conduct, the District Court erred in imposing the three-level enhancement. He further argues that this enhancement, by its very terms, is triggered only when the defendant has disrupted an *ongoing* proceeding of some sort, and that because no such proceeding existed when he

abducted the children in January 1995, the enhancement cannot be applied to him.

We disagree first with Ahmed's construction of Application Note 1. The term "includes" clearly indicates that the subsequent listing of acts warranting this enhancement is not exclusive, and that other acts—if similarly or even more disruptive of the administration of justice—could serve as bases for the section 2J1.2(b)(2) enhancement.

■ Second, we believe that the District Court properly found that Ahmed's "self-help" act of removing the children from New York could serve as a basis for this enhancement. Although the abduction did not interfere with an ongoing proceeding, this act prevented proper legal proceedings from occurring by taking matters completely outside the purview of the administration of justice. As the District Judge stated,

[Ahmed's] conduct ... was[,] by analogy, more egregious than that referred to in [Application Note 1], because rather than terminating a judicial proceeding by his actions, he made certain that the action was one that would never be commenced. It is a situation in which he deemed himself the judge, and then he made the decision.... The defendant ... wholly ignored the lawful process, and acting in the form of a vigilante, if you will, took matters into his own hands.

## Conclusion

We reject Ahmed's remaining arguments as either forfeited because not previously raised, or simply without merit. The judgment of the District Court is affirmed.