[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On November 11, 1997, the plaintiff, the wife of the defendant, initiated an action for dissolution of marriage in Superior Court, Judicial District of Middlesex, USA. At such time she alleged that her address was P. 0. Box 891, Deep River, Connecticut 06419, USA, and that the residence of the defendant was Rembrandt #1, 2202 BP Noordwijk ZH, The Netherlands. Said matter was returnable to this court on December 23, 1997 and the complaint seeks the dissolution of marriage of the parties and sundry other relief as is usual in such actions.
The complaint was served on the defendant and counsel has appeared of record on his behalf. Thereafter, the defendant filed a petition for return of the child to the defendant/petitioner and alleged that the matter was controlled by the Uniform Child Custody Jurisdiction Act, Conn. Gen. Stat. § 46b-93 and § 46b-113; and the International Child Abduction Remedies Act, Pub.L. No. 100-300, 42 U.S.C. § 11601 et seq., (which implemented the "Hague Convention" for the United States) and Article II of the Constitution of the United States. The petition was filed on January 20, 1998. On February 2, 1998 the plaintiff filed an objection to the defendant's petition for return of the child to the defendant/petitioner. In said objection the plaintiff/mother asserts that the removal of the child from Holland was not wrongful and that the return of the child to the Netherlands would present a grave risk to the child and would expose the child to physical and psychological harm, and place him in an intolerable situation. Amongst other allegations, the mother also placed into issue the father's contention that Holland is the child's habitual place of residence. It is the mother's claim that the child has lived the majority of his life in the United States, which along with other factors establishes the United States as his habitual residence.
It is on these joined issues that the matter came to trial before this court. An attorney was appointed by the court to CT Page 6403 represent the child and, in addition, a guardian ad litem was appointed on behalf of the child.
Pursuant to pendente lite orders, temporary custody of the child was granted to the mother and both parties were enjoined from removing the child from this jurisdiction.
Pursuant to court order and the agreement of the parties, the child was evaluated by Dr. Keith Roeder, a child psychologist, and the child was examined and interviewed at Yale University in connection with the claims of the mother that the father had sexually abused him.
The parties have presented most fully their claims and evidence to this court over a period of five days. Based upon the admissible, credible and relevant evidence presented therein, the following constitute the findings of fact and conclusions of law of this court.
As the issues and the evidence refine them, the basic claims of the parties revolve around two issues. The first issue is whether or not the habitual residence of the child was The Netherlands as claimed by the father; and the second issue is whether or not the evidence places the situation with respect to this child within the "grave risk" exceptions as delineated in Article 13B of the Hague Convention Treaty. The petitioning father has the burden of proving habitual residence by a fair preponderance of the evidence. In connection with the assertions of the mother regarding the grave exception defense, the mother has the burden of proving her claims by clear and convincing evidence.
The plaintiff and the defendant intermarried at Essex, Connecticut on September 22, 1985. They have one minor child issue of this marriage, Alexander Robert Joost Turner Frowein, who was born on June 8, 1990. The father who is a native citizen of The Netherlands de-registered his citizenship in Holland in 1983. He had a long term relationship with the mother prior to their marriage and they lived separately at least up to the time they were married. When the child was born on June 8, 1990, the mother was living and gave birth to the child in New York City. At that time the father was living in Holland. During the vast majority of the period of time in which they were married, the parties substantially lived apart, either in different countries, or, while in the United States, with the father living in his CT Page 6404 home in Deep River and the mother working in New York City and commuting to Connecticut most weekends. During the period of time after Alexander was born, she took the child weekly with her to New York and commenced to be and remains the nurturing ongoing care giver of this child. After the parties moved to Holland in 1994, while they did live together for a period of time, they were, for the majority of their lives in Holland, living separately. Each had regular contact with the child. The mother is a United States citizen and has never been registered as a citizen of The Netherlands.
The child lived the first four years of his life in the United States until the parties moved to Holland in 1994. During the period of their marriage their relationship has been stormy, at least, and in many aspects, has escalated into multiple scenes of violence. The father has physically abused the mother and has emotionally abused her by way of ongoing racial epithets and epithets concerning her physical appearance. The mother is a Jamaican National by birth. Since the de-registering of the father in 1983, he has never caused the mother to be registered as a citizen of Holland. The child is a mixed racial child of American citizenship.
The father has been a substantial wage earner during the period of the marriage and the mother has been employed sporadically in the international banking world as a senior executive and manager and has earned income of from $85,000 — $200,000 per year, employed under Limited Term Contracts with City Bank or the ING Bank during the period of her marriage. While they were in Holland, the mother's capacity to obtain substantial employment was severally limited not only by her female minority status but also by Dutch laws that place substantial limitations on the ability of non-Dutch citizens to obtain full time employment in Holland.
During the course of the trial the mother's testimony and that of other witnesses indicated that the mother entertained and presently entertains a substantial fear of the father, her husband. The court finds that this fear is substantiated on the evidence presented. The father also treated the child's nannys poorly, causing them to resign.
After the Fall of 1997, the father controlled and/or possessed the United States passport of the child until October 30, 1997 when the mother obtained a replacement passport for the CT Page 6405 child from the U.S. Consulate in Holland.
The parents moved to Holland in 1994 and they lived together until sometime in 1996 when they separated. The mother filed a divorce action in Holland and sought custody of the child. Their life together after they moved there in 1994 was hectic and abusive from the standpoint of the mother. Prior to the time of their move to Holland in 1994 they entered into a form of agreement or contract in which, amongst other things, the father agreed that he would not use any force or coercion nor would he claim any proprietary rights over the child. She promised to remain in Holland to aid his job search and, at least at that time, this promise was limited to three weeks. There was an understanding that if Onno Frowein succeeded in finding employment in Europe, his wife and son would reside with him permanently. The father understood, by virtue of this agreement, that he had made no arrangements regarding Alexander's custodial support by any of his friends or family members. From the testimony the court concludes that the mother entered into whatever this agreement may constitute on the implied condition that he would not exercise controlling rights over, her son nor would he continue to mistreat and/or abuse her physically or emotionally.
In the Summer of 1997 the mother filed an action seeking dissolution of her marriage to the father in the Dutch courts. On September 11, 1997, pursuant to a court proceeding in which the mother did not substantially participate, the court entered a temporary custody order giving the custody of the child to his father. Prior to this time, in 1996, the mother had made claims and allegations both to the father and to the police that the father had sexually abused the child. This claim resulted from statements made by the child to her and her discovery of the child in the bed of the father with his pajama bottoms removed from his body.
Thereafter, the mother filed a petition to the court to rehear the matter of temporary custody and at the second hearing as the record indicates she was able to present a little more fully her claims. As a result of the first hearing the court had referred the matter for an evaluation by the Dutch Child Protection Agency and as of October 9, 1998 when the request of the mother for reconsideration of the temporary custody orders was heard, said Protection Agency had not undertaken any semblance of the investigation. Her claims did not result in any CT Page 6406 action taken by the police, nor did the Dutch court accord to those claims any credibility. The Dutch court continued the temporary custody of the child with the father.
Thereafter on October 30, 1997, with the advice of counsel, the mother unilaterally and properly withdrew her action for divorce from the Dutch court, obtained a replacement passport for her son and withdrew from Holland to Brussels. From there, both mother and son returned to the United States where they have remained through the date of this hearing.
The Hague Convention is implemented by the International Child Abduction Remedies Act (ICARA). "Any person seeking to initiate judicial proceedings under the Convention for the return of a child. . . . may do so by commencing a civil action . . ., in any court which has jurisdiction of such action and which is authorized to exercise this jurisdiction in the place where the child is located at the time the petition is filed." ICARA Section 11603.
A person seeking to initiate judicial proceedings under the Convention may do so by filing a petition for the relief "sought in any court which has jurisdiction of such action and which is authorized to exercise this jurisdiction in the place where the child is located at the time the petition is filed." This action was properly brought in this jurisdiction and thereby appropriately invokes the considerations contained in ICARA and the Hague Convention.
A petitioner, the father herein, shall establish by a preponderance of the evidence that, in the case of an action for the return of a child that the child has been wrongfully removed or retained within the meaning of the Convention, once a plaintiff establishes that the removal was wrongful, the child must be returned unless the defendant establishes an exception. The exceptions are construed narrowly "and are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute."Friedrich v. Friedrich, 78 F.3d 1060, 1067 (6th Cir. 1996) (Friedrich II).
Habitual residence is not defined in the statute. "[T]o determine the habitual residence, the court must focus on the child, not the parents, and examine past experience, not future intentions. [H]abitual residence can be `altered' only by change CT Page 6407 in geography in the passage of time . . ." Freidrich v. Freidrich,983 F.2d 1396, 1401 (6th Cir. 1993) (Freidrich I). The courts addressed the issue on a fact specific, case by case, basis and "nowhere does the Hague Convention "suggest that it is appropriate to borrow an arbitrary cutoff date from a state statute in determining whether habitual residence has been established." Feder v. Evans-Feder, 866 F. Sup. 860, 866 (1994).
"[T]he notion [of habitual residence] is free from technical rules, which can produce rigidity and inconsistencies as between legal systems. . . . The facts and circumstances of each case should continue to be assessed without resort to presumptions or presuppositions. . . . All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." Feder v. Evans-Feder, supra, 865.
"Article 3 of the Hague Convention provides that parental rights are to be defined by `the law of the State in which the child was habitually resident immediately before the removal or retention.'" U.S. v. Amer, 110 F.3d 873, 878 (2nd Cir. 1997). At the time of the removal of those rights must have been actual exercised. Freidrich II, supra, 1060. The court inFreidrich II declined to create a definition of "exercise". Instead, the court found "[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, it is to liberally find `exercise' whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." Id., 1065. "[A]s a general rule, any attempt to maintain a somewhat regular relationship with the child should constitute `exercise'." Id., 1066.
The court in the contracting state is not required to return the child when:
 1. More than one year has passed since the removal and the child has now settled into its environment. Hague Convention, Article 12.
2. The return would expose the child to grave risk of physical or psychological harm. The Hague Convention, Article 13b. The exception is construed narrowly and must be proven by clear and convincing evidence. See Thompson v. Thompson, 119 D.L.R. 253 (Can. 1994). General allegations concerning separation of a child CT Page 6408 from a primary caretaker insufficient to establish grave risk, but "severe potential harm. . . . that also amounts to an intolerable situation would trigger the exception. Nunez-Escudero v. Tice-Menley, 58 F.3d 374 (8th Circuit 1995). See also Rydder v. Rydder, 49 F.3d 369, 372 (8th Circuit 1995). The child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take into account its views. Hague Convention, Article 13. A nine year old child not of sufficient age and maturity was found not to have its views heard. Sheikh v. Cahill,
145 MISC 2d 171, 546 N.Y.S. 2d 517 (1989).
In this matter, the court declined to hear the views of the child who was a little less than 7 1/2 years old at the time of the abduction and who reached his eighth birthday on June 8, 1998. Since the court determined that he was not of sufficient age to have his views heard, his rights have been adequately represented by an attorney appointed to represent him and by a guardian ad litem appointed for him.
There are certain considerations that this court should not indulge in. "A court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying dispute." Freidrich II, supra, 1063.
The court shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned. Article 16, Hague Convention. The court may "take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the state of habitual residence of the child, without recourse to the specific procedures for the proof of that law and for the recognition of foreign decisions which would otherwise be applicable." Article 14, Hague Convention.
In this jurisdiction, in the case of Pantazatou v.Pantazatos, Superior Court, judicial district of Hartford, Docket No. 713571 (April 29, 1997, Barrall, J.), the plaintiff/wife brought a divorce action and request for custody of a minor in Connecticut while the father brought an action in Greece for the return of the child of the Hague Convention. The court found that the child's habitual residence was Greece but did not order the child returned because the respondent/mother proved by clear and convincing evidence that return of the child to Greece would CT Page 6409 cause a grave risk of physical and psychological harm to the child. The court considered the circumstances which would be faced by the child and the mother if they returned to Greece. Because the mother faced a possible contempt order if she returned and also lacked the means to support herself and her child in Greece, the court found that the child would face a grave risk if returned.
In Renovales v. Roosa, Superior Court, judicial district of Hartford, Docket No. 392232 (September 27, 1991, Norko, J.), there was a petition for the return of two children retained in the United States by the mother. The petition was brought in Spain. There was a previous order from the court in Spain granting temporary custody to the father.
The court found that the habitual residence was Spain and that the children had been wrongfully removed. The mother claimed that the children should not be removed because it would subject them to a grave risk of harm. Each of the parties produced testimony from psychologists. The court found that the defendant failed to prove the application of the exception by clear and convincing evidence. Although the evidence showed that the father was less than a perfect parent, the evidence failed to show that the risk would rise to the level of an intolerable situation. This case represents an analysis of the grave risk exception.
This court finds and concludes that, at the time of the removal of the child from Holland, he was a habitual resident of Holland. He had lived in that country with his mother and father since June of 1994. He was attending school regularly. Although the mother and father were not leading a happy marital life, he lived from time to time with his mother and at some times was with his father. He regularly engaged in activities with his fellow classmates and friends including soccer and west on skiing trips with his parents. He was appropriately progressing in the Holland school system. He had a long history of continual care by resident physicians in the area of Holland in which he lived.
At the time of his removal from Holland by his mother, as noted above, a divorce action had been initiated by her and as a result of hearings in the Dutch court the defendant, his father, had been granted temporary custody of the child. Thus, from all the facts this court concludes that at the time of the abduction the father was in fact exercising de jure parental and custodial rights over the child. CT Page 6410
As a further testament to the child's settlement in Holland, since he has been removed to the United States his mother has allowed certain continued contacts with his former Dutch friends and schoolmates. The court finds that he had established ongoing permanent contacts in his life in Holland, that he was settled there and that he was a habitual resident of Holland at the time of his removal from that country by his mother on October 30, 1997.
The court now moves to the final consideration in this case as to whether or not the evidence presented to it forms a sufficient foundation for the court to conclude that it should apply the grave risk exception in connection with a decision as to whether or not to return this child to Holland.
In 1996, the mother discovered the child half clad, with his pajama bottom missing, in bed with his father who was also lacking pajama bottoms. She raised questions to the father of sexual abuse by him of the child which were denied. At the time of her discovery of this, the child was in fact still sleeping in the bed and his pajama bottoms were buried in the sheets. The child has stated to her on subsequent occasions that he had been sleeping with his father and that he was afraid to take off his clothes. He further stated that his father "hurt him". He also stated that he had two secrets with Daddy, which he could not tell her.
The mother further told the Dutch Child Protection Agency about her claims of child abuse and claims that these comments were not reflected in their interim report. Apparently the police declined to investigate and/or make any findings in connection with her allegations. Mother claims that she has not been able to obtain any protection for her child either from the police in Holland or from the Dutch Child Protection Agency, which although the case was referred to it on September 4, 1997, did not take any tangible action until approximately October 24, 1997.
Since the removal of the child to the United States, the parties including the child have been interviewed by Dr. Roeder, a competent psychologist and child psychologist. In addition, the child has been examined at the Yale Child Study Center by a psychiatric social worker and also by Dr. John Leventhal, a professor of Pediatrics at Yale University Medical School and a professional of considerable background experience and training. CT Page 6411
In connection with the question of alleged child abuse, Dr. Roeder has stated that, although it is a possibility, he could not so conclude with medical certainty in the absence of any physical evidence. Dr. Leventhal, however, based upon his own background and experience, has concluded as a result of the interviews with the child and his physical examination, that the anal tissues of the child did suffer traumatic injury. Dr. Leventhal testified, based on reasonable medical probability that the child has been subjected to anal sexual abuse.
In addition, there was testimony from a school psychologist that the child, under circumstances which were not shown to be interrogative in nature, spontaneously told school mates that his father had stuck his penis in his butt hole.
A neighbor and close friend of the family, Mrs. Eaton, further testified that when the child and his mother were at the Eaton home for purposes of a fun day with the children, Alexander walked outside and was looking at the house in which he had lived for a period of his life in Deep River, Connecticut, which was adjacent to the Eaton's home, Alexander spontaneously stated to Mrs. Eaton that ". . . . I'm going to buy me a big dog to bite my Daddy's penis off. . . ."
This young eight-year old child entertains feelings of anger for his father which apparently approach hatred. The court finds no basis in the evidence to conclude that these feelings have been engendered, encouraged or suggested by his mother. Although the father has not had personal contact with the boy since his removal to America, telephone contact has been made available but the child steadfastly refuses to talk with his father.
This court concludes, based upon all the evidence presented and particularly the evidence aforementioned above, that it has been established, in total, by clear and convincing evidence, that the father has sexually abused this child.
Visible evidence of sexual abuse has been developed since the child has been removed to this country by virtue of physical examinations. The anus has healed and thus the evidence is no longer susceptible to clinical evaluation by Dutch doctors if he were to return to Holland. As noted by both medical professionals in this case the child has developed a strong bond with his mother and any severing of that bond or lack of most frequent CT Page 6412 contact with his mother would cause severe psychological damage to this child.
Whether or not the mother would face prosecution in Holland for abduction or other action by the Dutch court cannot be adequately ascertained by this court at this time, but there certainly is basis in the evidence for the mother's fears that she would be subjected to some official sanctions should she return to Holland. As previously noted, her employment prospects as a non-Dutch National are very limited in Holland.
Under the all aforementioned circumstances, this court concludes that a return of this child to Holland would cause grave risk of physical and psychological harm to him. This conclusion is reached by this court in accordance with the proof burdens established by the Hague Convention.
Accordingly, this court concludes that the request of the father for a return of the child to Holland under the appropriate articles of the Hague Convention is not warranted and having found that the evidence established is by appropriate measure the grave risk exception, this court declines to so order.
The petition of the father under the articles of the Hague Convention is hereby denied. The mother and the child are ordered to remain under the jurisdiction of the State of Connecticut and the parties are ordered to seek appropriate ongoing pendente lite orders in connection with the pending action for dissolution of the marriage.
It is so ordered.
HIGGINS, J.