**UNITED STATES of America,**

v.

**Hassan SHAHANI–JAHROMI,**

**No. CRIM. 03–355–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 6, 2003.

Eugenia A.P. Cowles, Assistant United States Attorney, United States Attorney's Office, Alexandria, VA, for Plaintiff.

Geremy C. Kamens, Office of the Federal Public Defender, Alexandria, VA, for Defendant.

*MEMORANDUM OPINION*

ELLIS, District Judge.

In this international parental kidnapping prosecution, defendant is charged with having retained his daughter in Iran with the intent to obstruct the mother's lawful custody rights, in violation of the International Parental Kidnapping Crime Act ("IPKCA"), Pub.L. No. 103–173 (1993) (codified at 18 U.S.C. § 1204). Because his acts occurred wholly in Iran, defendant seeks dismissal of the indictment on two constitutional grounds:

(1) that defendant's prosecution violates the Due Process Clause of the Fifth Amendment; and

(2) that the IPKCA, by criminalizing this extraterritorial conduct, exceeds Congress' authority under the Commerce Clause.

**I.**

On February 12, 1985, defendant, formerly an Iranian citizen, became a naturalized citizen of the United States.[1] In 1991, he married Feretesh Raissan, an employee of the World Bank, who is an Iranian citizen and a lawful permanent resident of the United States. Later that year, the couple had a daughter, Ava Shahani, who became an American citizen at birth. In 1995, Raissan separated from defendant on alleged grounds of physical and emotional abuse. Thereafter, in 1995, a Fairfax court granted full legal and physical custody of Ava to Raissan. A final divorce

---

1. In the course of oral argument, counsel referred to defendant as possessing dual citizenship, American and Iranian. From the perspective of the United States, this claim is untenable. To become a naturalized American citizen, defendant took an oath that is now more than 200 years old in which he swore, *inter alia*, "to renounce and abjure absolutely and entirely all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which [he] was before a subject or citizen." 8 U.S.C.A § 1448. Thus, insofar as the United States is concerned, defendant was required to renounce his loyalty and fidelity to Iran, to renounce, in other words, his Iranian citizenship. Also, newly-naturalized Americans are typically required to surrender their former passports. Iran, of course, is free to continue to consider defendant an Iranian national, but this does not alter the fact that, as far as the United States is concerned, he has formally and under oath effectively renounced that citizenship to become an American.

decree was granted by the Fairfax court in 1997, in which Raissan was again awarded full custody of Ava.

In the summer of 1996, Raissan, with the Fairfax court's permission, traveled to Iran with her daughter to visit her ailing mother and other relatives living in that country. Defendant, it appears, followed Raissan and Ava to Iran, apparently in violation of the Fairfax court's orders.[2] The government alleges that on September 9, 1996, while in Iran, defendant removed Ava from her mother's custody and kept her in Iran until September 2003, a period of seven years.[3] Based on this allegation, defendant was indicted under the IPKCA for retaining his American-born child in Iran with intent to obstruct the lawful exercise of parental rights as reflected in the Fairfax court order assigning custody of the daughter to her mother in the United States. Defendant claims that his actions in removing Ava while in Iran were consistent with Iranian law.[4]

## II.

■ Defendant first moves to dismiss the indictment on the ground that a prosecution for conduct that occurs entirely in a foreign country violates the Due Process Clause. Defendant argues that the application of United States law in such a situation is fundamentally unfair, especially given that the conduct alleged here was lawful under Iranian law.

■ Although the precise question presented is undecided in this circuit, the general principles dispositive of this issue are well settled. In general, congressional legislation, including criminal statutes, applies only within the territorial jurisdiction of the United States. *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("It is a longstanding principle of American law 'that legislation of Congress', unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.") (citation omitted). Yet, this limit on the extraterritorial application of a federal statute can be overcome "if there is an 'affirmative intention of the Congress clearly expressed.'" *Reyes–Gaona v. North Carolina Growers Assoc., Inc.*, 250 F.3d 861, 864 (4th Cir.2001) (citation omitted). The IPKCA is just such a congressional expression. By its terms,[5]

---

2. The Fairfax court ordered that defendant surrender his passport to the Fairfax court as well as notify the court of any intent to relocate permanently.

3. Ava is now back in the United States in the custody of her mother. It appears that defendant cooperated in ensuring her return to the United States by furnishing a power of attorney necessary to effectuate Ava's departure from Iran.

4. Defendant's claims concerning Iranian law are unsupported by any competent proof or affidavit. *See United States v. Mitchell*, 985 F.2d 1275, 1280 (4th Cir.1993) ("In determining questions of foreign law, courts have turned to a wide variety of sources including affidavits and expert testimony ...."); *see also Universe Sales Co., Ltd. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038 (9th Cir.1999) ("[C]ourts may ascertain foreign law through numerous means, expert testimony accompa-

nied by extracts from foreign legal materials has been and will likely continue to be the basic mode of proving foreign law."). Although not entirely clear, it appears that defendant takes the position that under Iranian law, the American divorce was not effective in Iran and that the daughter could not leave Iran without the father's permission, given that Iran still recognized the father and mother to be Iranian nationals.

5. The statute reads, in relevant part:

Whoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both. 18 U.S.C. § 1204(a).

the statute addresses international parental kidnapping and makes it a federal crime to retain outside the United States a child who was once in the United States with the intent to obstruct the lawful exercise of parental rights. 18 U.S.C. § 1204(a). The crime at issue necessarily involves the retention of a child outside the territorial borders of the United States; therefore Congress has clearly expressed its intention that the statute apply to extraterritorial conduct. Yet, the analysis does not end here for the constitutional due process question remains to be resolved. Put another way, Congress may clearly express its intent to reach extraterritorial conduct, but a due process analysis must be undertaken to ensure Congress' reach does not exceed its constitutional grasp.

■ It appears the Fourth Circuit has yet to address the extent to which the Due Process Clause limits the United States' assertion of jurisdiction over conduct violative of the IPKCA committed outside our borders. Another well-settled general constitutional principle makes clear that application of United States law in such a situation must be neither arbitrary nor fundamentally unfair. The Supreme Court articulated this general due process principle in a state choice of law context in *Allstate Insurance Company v. Hague*, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). There, the Supreme Court held that "for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." 449 U.S. at 312–13, 101 S.Ct. 633.[6] The due process issue presented here is essentially similar to the due process issue presented in *Hague* and similar cases where a defendant challenges the extraterritorial application of state law through the Due Process Clause of the Fourteenth Amendment. *See generally* Lea Brilmayer & Charles Norchi, *Federal Extraterritoriality and Fifth Amendment Due Process*, 105 Harv. L.Rev. 1217 (1992) (surveying prominent cases and arguing that courts should recognize Fifth Amendment limits on choice of law in the context of federal extraterritoriality in the same manner that they recognize Fourteenth Amendment limits on state extraterritoriality).

The general constitutional principle announced in *Hague* also finds expression in the criminal context. The Second and Ninth Circuits have held that to apply a federal criminal statute to a defendant extraterritorially without violating due process " 'there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair.' " *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir.2003) (quoting *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir. 1990)).[7] The nexus requirement used in

---

**6.** *See also New England Leather Co. v. Feuer Leather Corp.*, 942 F.2d 253, 257 (4th Cir. 1991) (noting, in choice of law context, that application of North Carolina law to extraterritorial conduct occurring in another state raises constitutional concerns and specifically raises the question "whether North Carolina has sufficient contacts with this litigation so that application of its substantive law would be neither arbitrary nor fundamentally unfair under the Due Process Clause.").

**7.** The defendants in *Yousef* conspired to attack a dozen United States-flag aircraft "in an effort to inflict injury on this country and its people and influence American foreign policy, and their attack on the Philippine Airlines flight was a 'test-run' in furtherance of this conspiracy." 327 F.3d at 112. Although this conspiracy was hatched outside the territorial borders of the United States, the Second Circuit found that "[g]iven the substantial intended effect of their attack on the United States and its citizens, it cannot be argued seriously that the defendants' conduct was so

these circuits appears to take into consideration factors comparable to the analysis articulated by the Supreme Court in *Hague* in the state choice of law context by ensuring a sufficient tie to the United States rendering application of United States law inoffensive to fundamental principles of due process.

■ Thus, this caselaw makes clear that the due process question presented here is whether the application of the IPKCA to defendant's retention of his daughter in Iran in violation of the mother's custody rights is arbitrary or fundamentally unfair. It is plainly neither. Here, defendant is an American citizen. He married Raissan in the United States. Their daughter was born in the United States and is an American citizen. When defendant and Raissan separated, a Fairfax court granted full custody of the daughter to her mother. The Fairfax court further ordered that defendant surrender his passport and provide notice to the court of any intent to relocate permanently. Defendant violated the Fairfax court's orders by following his wife and daughter to Iran, by physically removing his daughter from her mother's custody, relocating permanently to Iran without giving any notice to the Fairfax court, and

by keeping his daughter in Iran, away from her mother for seven years. Given these facts, the United States manifestly has a clear interest in ensuring that parental rights are respected, especially when the marital domicile of the parents is within the United States. By deterring both the removal of children from the United States to foreign countries and the retention of such children there in order to obstruct parental rights, the IPKCA is directly aimed at furthering this interest. It is thus clear that the United States' contacts with this defendant and with the subject-matter of this case are of such significance that application of the IPKCA in this context is neither arbitrary nor fundamentally unfair.[8]

This result finds firm support in analogous authority from other circuits. In *Davis,* the Ninth Circuit addressed a due process challenge to the extraterritorial application of the Maritime Drug Law Enforcement Act ("MDLEA"). There, the defendant was convicted of possession of, and conspiracy to possess, marijuana on a vessel with intent to distribute. The defendant was not a United States citizen, nor was his vessel a U.S. flag ship; his arrest took place on the high seas.[9] Even so, the Ninth Circuit found that there ex-

---

unrelated to American interests as to render their prosecution in the United States arbitrary or fundamentally unfair." *Id.*

8. While there may be situations where the application of the IPKCA might violate due process, defendant's claim is as-applied rather than a facial challenge to the statute. *See United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). At any rate, to mount a facial challenge to a legislative act, defendant must establish that no set of circumstances exists under which the IPKCA, or at least the retention portion of the Act, would be valid. *See id.* ("The fact that [the Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment.") (citation omitted).

Defendant has neither made, nor attempted to make, such a showing here.

9. The ship in *Davis* sailed under a British flag. The British government specifically consented to a U.S. Coast Guard search of the ship, which led to the discovery of the contraband. The British government also waived objection to the enforcement of United States law by the United States. Other circuits have reached a conclusion different from that reached by the Ninth Circuit in *Davis.* While the Ninth Circuit requires the existence of a nexus between the United States and the extraterritorial conduct, the First, Third, and Fifth Circuits have all rejected the nexus requirement, requiring instead only that a defendant's prosecution be neither arbitrary nor fundamentally unfair. *See United States v. Suerte,* 291 F.3d 366 (5th Cir.2002) (collecting and discussing cases). This difference is less

isted a sufficient nexus to apply the MDLEA to Davis' extraterritorial conduct without violating the Due Process Clause because the facts of the case "support the reasonable conclusion that Davis intended to smuggle contraband into United States territory."[10]  *Davis*, 905 F.2d at 249.[11] The Ninth Circuit stated the rationale for its nexus requirement in *United States v. Klimavicius–Viloriaa*, where the court explained that

> [t]he nexus requirement serves the same purpose as the "minimum contacts" test in personal jurisdiction.  It ensures that a United States court will assert jurisdiction only over a defendant who "should reasonably anticipate being haled into court" in this country.

144 F.3d 1249, 1257 (9th Cir.1998), *cert. denied*, 528 U.S. 842, 120 S.Ct. 310, 311, 145 L.Ed.2d 94 (1999) (citation omitted).

  ▮ In this case, defendant had ample reason to anticipate being haled into court in the United States for his conduct in Iran. He and his daughter are both American citizens.  He was aware of a Fairfax court order granting full legal and physical custody of his daughter to her mother. Moreover, he knew that he had been ordered to surrender his passport to the Fairfax court and to provide notice to the court of any intent to relocate permanently.  By traveling to Iran and retaining his daughter there, he knew he was violating these court orders and had every reason to anticipate being taken to court in the United States upon his return to this country. The conduct that violated the Fairfax court's orders is the same conduct that provides the basis for defendant's prosecution under the IPKCA.  As a result, there is a sufficient nexus between defendant's conduct in Iran and the United States[12] such that his prosecution in the United States is neither arbitrary nor fundamentally unfair.[13]

real than apparent; the existence of a nexus is what makes the prosecution neither arbitrary nor fundamentally unfair.

10. Similarly, defendant's actions show that he intended to violate the Fairfax court's custody order through his conduct in Iran.

11. Put in terms of the *Hague* test, the defendant in *Davis* specifically directed his conduct at the United States and the United States thus had a significant interest in preventing and punishing his smuggling of drugs into the United States.

12. Defendant's citation to *Home Insurance Company v. Dick*, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926 (1930), actually supports this conclusion.  In *Home Insurance Company*, the Supreme Court held that the application of Texas law to an insurance contract made and performed in Mexico violated due process.  The Court explained that

> nothing in any way relating to the policy sued on, or to the contracts of reinsurance, was ever done or required to be done in Texas.  All acts relating to the making of the policy were done in Mexico.  All in relation to the making of the contract of reinsurance were done there or in New York. And, likewise, all things in regard to performance were to be done outside of Texas.

281 U.S. at 408, 50 S.Ct. 338, 74 L.Ed. 926 .  As a result, the defendant in that case had no reason to expect that Texas law would apply to him because the subject matter of the dispute had no relation to Texas, *i.e.*, defendant did not have sufficient contacts with the forum.  By contrast, defendant here has significant contacts with the United States and ample reason to anticipate being taken to court in the United States and the application of American law.

13. Although the *Klimavicius–Viloria* court equated the nexus requirement to the "minimum contacts" test for personal jurisdiction articulated in *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the "minimum contacts" test is similar to the *Hague* test.  Many of the same factors are taken into account, though clearly the mere fact that a forum has personal jurisdiction over a defendant is insufficient in and of itself to resolve all choice of law issues. *See, e.g., Phillips Petroleum Co.*

Further support for the conclusion that this prosecution is consistent with due process is found in *Blackmer v. United States*, where the Supreme Court sanctioned the "nationality principle," a principle that finds its origins in international law and permits a state to prosecute offenses committed by its nationals abroad. *See* 284 U.S. 421, 52 S.Ct. 252, 76 L.Ed. 375 (1932). The *Blackmer* Court held that an American citizen residing abroad could be punished for contempt for failing to appear as a witness in a United States court after a subpoena issued and notice was given, reasoning that "[b]y virtue of the obligations of citizenship, the United States retained its authority over him, and he was bound by its laws made applicable to him in a foreign country.... For disobedience to its laws through conduct abroad, he was subject to punishment in the courts of the United States." *Id.* at 436, 52 S.Ct. 252. Similarly, in *Skiriotes v. Florida*, the Supreme Court again relied on this principle in upholding the conviction of a Florida citizen charged with violating a Florida statute proscribing the use of diving equipment in the taking of sponges from the Gulf of Mexico. *See* 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941). While defendant here correctly points out that both *Skiriotes* and *Blackmer* address

jurisdictional predicates for the application of United States law and not whether the application of that law is fundamentally unfair, these cases still have relevance to the issue presented here.[14] First, while defendant does not, strictly speaking, challenge jurisdiction here, his challenge to the application of United States law is not simply a choice of law question because the decision whether to apply United States law in this case effectively determines jurisdiction. If the IPKCA does not apply, there is no jurisdiction. As a result, there is no clear separation between jurisdiction and choice of law in this case. In essence, defendant challenges the United States' criminal jurisdiction over conduct occurring abroad, which is analogous to the situations presented in *Blackmer* and *Skiriotes*. Second, the rationale of the nationality principle does bear on the fairness of applying United States law to extraterritorial conduct by an American citizen. Although defendant's alleged criminal conduct occurred in Iran, he "continued to owe allegiance to the United States." *Blackmer*, 284 U.S. at 436, 52 S.Ct. 252. Along with the many benefits that American citizenship confers upon those who hold it, come certain "obligations of citizenship." *Id.* Among these are the obligation to obey laws that specifically apply to one's conduct.[15] While the nationality principle

v. *Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Indeed, a defendant passing through a state for a few hours and served with process is subject to that state's jurisdiction. *See Burnham v. Superior Court*, 495 U.S. 604, 617–18, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990). This, of course, is insufficient by itself to justify application of the forum state's substantive law. In this case, by contrast, the type of contacts defendant has with the United States make it fair not only to subject him to the jurisdiction of a United States court, but also make fair the application of United States law to defendant's conduct.

14. Defendant also attempts to distinguish *Skiriotes* by noting that the conduct at issue there

occurred on the high seas. Yet, in that case, the Court stated that "the United States is not debarred by any rule of international law from governing the conduct of its own citizens upon the high seas *or even in foreign countries* when the rights of other nations or their nationals are not infringed." 313 U.S. at 73, 61 S.Ct. 924 (emphasis added).

15. At oral argument, defendant's counsel compared the case at bar to one in which American citizens are prosecuted in the United States for possession and use of marijuana occurring entirely in the Netherlands, where such conduct is legal. The comparison is inapposite. Congress has not clearly expressed an intent for this country's drug possession laws to apply extraterritorially and

does not alone serve to make the extraterritorial application of the IPKCA accord with due process in all situations involving an American citizen, the Supreme Court's acceptance of this principle implies that application of the nationality principle is generally not fundamentally unfair. In any event, defendant's citizenship is only one of many factors providing a sufficient nexus to the United States for the application of the IPKCA in this case.[16]

Finally, defendant's reliance on *Nielsen v. Oregon,* 212 U.S. 315, 29 S.Ct. 383, 53 L.Ed. 528 (1909), is misplaced. In *Nielsen,* the Supreme Court found unconstitutional an attempt by Oregon to prosecute a citizen of Washington for fishing with a "purse net" in waters where Washington and Oregon shared concurrent jurisdiction. That defendant's use of purse nets was entirely within the state of Washington.

While Oregon had a statute specifically outlawing the use of purse nets, Washington had a statute specifically allowing their use. In other words, one state's statute prohibited conduct that the other state's statute specifically authorized. This is not true in the instant case. First, there is no showing that Iranian law specifically authorizes defendant's conduct in this case, that is to say that Iranian law ignores custody orders of another country and specifically authorizes the kidnapping that took place. At best, it appears that an Iranian court might grant custody to the father were it to decide custody in the first instance.

More importantly, however, there is an important difference between conflicts among states of the Union and conflicts between the United States and a foreign country. The states of our Union are co-

thus Americans in the Netherlands would have no notice that their conduct could subject them to prosecution in the United States. By contrast, congressional intent here is clear and while defendant may not have been aware of the IPKCA, he was certainly aware that his conduct violated the Fairfax court's orders, as those orders, in part, were specifically directed at him.

**16.** Defendant contends that the laws of another country—Iran—are implicated in this case; he argues that his conduct was consistent with Iranian law. Similarly, it appears that the *Blackmer* defendant's conduct in refusing to comply with an American subpoena in France was likewise consistent with French law. This does not lead to the conclusion that the sovereign interests of France were implicated there or that Iran's are implicated here. Despite a brief and unsupported assertion to the contrary at oral argument, this is not a case where Iranian law conflicts with United States law in the sense that defendant's compliance with American law required his violation of Iranian law. *See Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) (compliance with American court's production order would violate Swiss law,

therefore plaintiff's failure to comply should not lead to dismissal with prejudice, especially since plaintiff made good faith efforts to comply). Defendant does not contend that Iranian law required him to remove his daughter from the mother's custody, retain her in Iran and preclude her from returning to the United States; he argues only that his actions were consistent with Iranian law. Moreover, even if compliance with the IPKCA required defendant's violation of Iranian law, it was defendant who created this situation by purposefully following his wife and daughter to Iran for the purpose of removing the daughter from the mother's custody and retaining the daughter in Iran in violation of the Fairfax court's orders. Defendant cannot now use Iranian law to shield himself from the consequences of his purposeful violation of American law. While it may ordinarily be fundamentally unfair to require that an American citizen violate Iranian law while in Iran, thus subjecting himself to punishment there, in order to comply with the laws of the United States, defendant has not properly or sufficiently raised this argument here. *See supra* note 4 and accompanying text. Thus, there is no basis on this record to conclude that the application of United States law in this case in any way affects the legitimate interests of Iran.

equal sovereigns in a federal system and the Full Faith and Credit Clause of the Constitution "direct[s] that a State, when acting as the forum for litigation having multistate aspects or implications, respect the legitimate interests of other States and avoid infringement upon their sovereignty." *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 322, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) (Stevens, J., concurring). In *Carroll v. Lanza*, the Supreme Court indicated that the Full Faith and Credit Clause would be invoked to restrain "any policy of hostility to the public Acts" of another state. 349 U.S. 408, 413, 75 S.Ct. 804, 99 L.Ed. 1183 (1955). This is precisely the injury that the Court focuses on in *Nielsen* in stating the issue as follows:

> Can the state of Oregon, by virtue of its concurrent jurisdiction, disregard that authority, practically override the legislation of Washington, and punish a man for doing within the territorial limits of Washington an act which that state had specially authorized him to do? We are of the opinion that it cannot.... [T]he opinion of the legislatures of the two states is different, and the one state cannot enforce its opinion against that of the other.

212 U.S. at 321, 29 S.Ct. 383. The Full Faith and Credit Clause is, of course, inapplicable when the law of a foreign nation, rather than that of a sister state, is at issue. The United States is thus under no constitutional obligation to respect the interests of a foreign nation in the same manner that a state is obligated to do so with respect to a sister state by the Full Faith and Credit Clause.[17]

In sum, due process is not offended by the application of the IPKCA to defendant's unlawful acts in Iran because the strong connection between defendant, his conduct, and the United States make plain that his prosecution in the United States is neither arbitrary nor fundamentally unfair.

### III.

█ Defendant next argues that the retention portion of the IPKCA may, by its terms, reach defendant's unlawful conduct in Iran, but that in so doing, the statute's reach exceeds its constitutional grasp under the Commerce Clause.[18]

In *United States v. Lopez*, the Supreme Court identified three categories that Congress may regulate under its commerce power: (1) the channels of interstate commerce; (2) the instrumentalities of, or persons and things in, interstate commerce; and (3) activities having a substantial relation to interstate commerce, *i.e.*, those activities that substantially affect interstate commerce. 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). These categories merit elaboration.

█ The channels of interstate commerce are the routes through which commerce travels and the term refers, *inter alia*, to "navigable rivers, lakes, and canals ...; the interstate railroad track system; the interstate highway system; ... inter-

---

**17.** *Nielsen* also involved conduct that was not *malum in se*, a fact of which the Court made note. *See* 212 U.S. at 320, 29 S.Ct. 383. This is important not because defendant's conduct in this case is necessarily *malum in se*, but because the defendant in *Nielsen* thus had no reason to know his conduct violated Oregon law. While this point is not specifically discussed by the *Nielsen* Court, it is sensible to conclude that the nature of the crime and the defendant's resultant lack of notice would fuel due process concerns. By contrast, defendant here knew his conduct was in violation of the Fairfax court's orders, even assuming, *arguendo*, that his conduct could be termed *malum prohibitum*.

**18.** The Commerce Clause gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

state telephone and telegraph lines; air traffic routes; television and radio broadcast frequencies; and satellite communication frequencies on, over, and through which flow the goods, commodities, and information which constitute commerce between places in different states." *United States v. Miles,* 122 F.3d 235, 245 (5th Cir.1997) (quoted and cited with approval by the Fourth Circuit in *Gibbs v. Babbitt,* 214 F.3d 483, 490–91 (4th Cir.2000)). Instrumentalities of interstate commerce are the means by which people or things in commerce move; the term "refer[s] to trains, planes, cars, trucks, boats, and other vehicles by which people or commodities move in a channel of commerce." *Miles,* 122 F.3d at 246. Persons in commerce are "passengers, travelers, operators, or crew members on the instrumentalities of interstate commerce," while "things" in interstate commerce are "the goods or commodities being transported as cargo in interstate commerce." *Id.* Finally, the third *Lopez* category refers to "those intrastate economic activities having a substantial relation to interstate commerce or those activities that substantially affect interstate commerce." *Id.* at 242.

Only one court of appeals has addressed the constitutionality of the retention portion of the IPKCA under the Commerce Clause. In *United States v. Cummings,* 281 F.3d 1046 (9th Cir.2002), the defendant removed his children from the United States and retained them in Germany. He was charged under the IPKCA for both his removal and retention of the children, but he challenged only Congress' authority to criminalize the retention of an American child in a foreign country under the Com-

merce Clause. On this point, the Ninth Circuit held that Congress did indeed have such authority under the first *Lopez* category—regulating the channels of interstate commerce. By its terms, the IPKCA applies only when children are taken from the United States to another country. Therefore, the court noted that the defendant there "could not wrongfully retain his children in Germany without traveling there by some means of foreign commerce." 281 F.3d at 1049. Citing *United States v. Darby* [19] and *Caminetti v. United States,* [20] the court asserted that "Congress's power to regulate the use of the channels of commerce is well established" and concluded that "the wrongfully-removed children traveled in the channels of foreign commerce to reach Germany, where they were wrongfully retained." *Id.* Despite the cessation of the children's movement once in Germany, the court was "satisfied that Congress can act to prohibit the transportation of specified classes of persons in foreign commerce and thus proscribe conduct such as retention of those persons, even though transportation is complete." *Id.*

In reaching the conclusion that the IPKCA thus regulates the channels of commerce, the Ninth Circuit appears to have assumed that wrongful retention is necessarily preceded by wrongful removal, as was indeed the case in *Cummings.* In this case, however, the child was not wrongfully removed, but rather was taken voluntarily to Iran by her mother. Therefore, the channels of commerce were not wrongfully used in removing her from the United States as in *Cummings.*

---

**19.** 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (upholding congressional authority to prohibit interstate transportation of goods produced under substandard labor conditions).

**20.** 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (upholding Congress' ability to criminalize interstate trafficking of women for immoral purposes).

■ But that does not end the analysis because the Ninth Circuit had another ground for upholding the retention portion of the IPKCA in *Cummings*. The court also held the IPKCA to be a valid regulation of the channels of commerce because "it removes an impediment to the use of those channels. If a child is wrongfully retained in a foreign country, he or she cannot freely use the channels of commerce to return." 281 F.3d at 1050. "Congress has authority to prevent individuals from impeding commerce." *Id.*[21] By wrongfully retaining his children in Germany, the defendant interfered with the use of the channels of foreign commerce; and the IPKCA thus "removes an impediment to travel and makes possible unrestricted use of the channels of commerce." *Id.* The same reasoning applies here.

■ Defendant argues, however, that the IPKCA targets interference with lawful parental rights, and not the channels of commerce.[22] This argument is unpersuasive. "Congress's power over the channels of interstate commerce, unlike its power to regulate activities with a substantial relation to interstate commerce, reaches beyond the regulation of activities that are purely economic in nature. The power to regulate channels of interstate commerce allows Congress to make laws that protect the flow of commerce." *United*

*States v. Deaton,* 332 F.3d 698, 706 (4th Cir.2003). Thus, Congress' power to regulate the channels of commerce includes the power to regulate "air traffic routes" and other means of personal transportation. *Gibbs v. Babbitt,* 214 F.3d 483, 491 (4th Cir.2000). While defendant is correct that the IPKCA targets interference with lawful parental rights, it does not do so in the abstract; it specifically targets interference with lawful parental rights that impedes movement in the channels of commerce. The plain meaning of "to retain" is "to keep or hold in a specific location, condition, or position." Webster's II New Riverside University Dictionary (1984). And, in the IPKCA context, that location is anywhere outside the borders of the United States. By keeping the child outside the United States, her ability to use the channels of international commerce to re-enter the United States is impeded.

Another argument for upholding the IPKCA under the "channels" category becomes clear by imagining the resultant state of affairs had Congress not criminalized retention of a child in a foreign country through the IPKCA. In these circumstances, a non-custodial parent who wishes to kidnap his child need only wait for the custodial parent to travel with the child outside the United States before making his or her move. This would have an obvious effect on the use of the channels

---

**21.** Citing *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 253, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (upholding Title II of the Civil Rights Act of 1964 because racial discrimination "impede[s] interstate travel" through the channels of commerce); *United States v. Green,* 350 U.S. 415, 416–17, 76 S.Ct. 522, 100 L.Ed. 494 (1956) (upholding Hobbs Act, which made it a crime to obstruct, delay, or affect commerce or the movement of any article or commodity in commerce by robbery or extortion); *United States v. Mussari,* 95 F.3d 787, 790 (9th Cir.1996) ("The frustration of satisfaction of the obligation [to pay child support] ... is an impediment to interstate

commerce that Congress can criminalize as it has criminalized other impediments to interstate commerce.").

**22.** To bolster this argument, defendant asserts that the statute could apply to situations where the custodial parent is not in the United States or the child at issue legally resides outside the United States before retention by the non-custodial parent occurs. This hypothetical presents an interesting legal question neither presented, nor relevant to the as applied challenge asserted here. *See supra* note 8.

of commerce by the custodial parent and child. For fear of an overseas kidnapping, the child and his custodial parent would then become virtual prisoners of the United States—unable to step outside the country's borders for fear of an irredressable interference with their lawful parental rights. By proscribing retention, the IPKCA removes this impediment to international travel and thus appropriately regulates the channels of international commerce. *See Heart of Atlanta Motel, Inc. v. United States,*[23] 379 U.S. 241, 253, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (finding that racial discrimination had the effect of discouraging travel on substantial part of black community, thus empowering Congress to enact appropriate legislation barring racial discrimination).[24]

Finally, it is worth noting that a principal basis for the Supreme Court's recent concern over Congress' use of its commerce power is strikingly absent from this case. Central to the Supreme Court's decisions in *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), and *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000), is an underlying concern about the principles of federalism—a need to protect the distinction between that which is truly national and that which is truly local. In these cases, the Supreme Court particularly scrutinized congressional regulation of activity falling within an area of traditional state concern,[25] the countenance of which would blur the boundaries between the

**23.** *Heart of Atlanta Motel* was decided long before the Supreme Court delineated the three permissible categories under which Congress may use its commerce power. *See United States v. Lopez,* 514 U.S. 549, 558–59, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (outlining the three categories). As such, the Court in *Heart of Atlanta Motel* does not specifically uphold Title II of the Civil Rights Act of 1964 under the channels of commerce theory. Indeed, the Court relies on both the impediment to interstate travel that racial discrimination imposes on the African–American community, *see* 379 U.S. at 253, 85 S.Ct. 348, and the substantial and harmful effect that such discrimination has on interstate commerce, *see id.* at 258, 85 S.Ct. 348, to uphold the legislation. The *Lopez* Court, however, cites *Heart of Atlanta Motel* for the proposition that "Congress may regulate the use of the channels of interstate commerce," *Lopez,* 514 U.S. at 558, 115 S.Ct. 1624, thus implicitly sanctioning the "impediment to interstate travel" theory used in *Heart of Atlanta Motel* to uphold the Civil Rights Act.

**24.** Because the retention portion of the IPKCA is appropriate under Congress' power to regulate the channels of commerce, it is unnecessary to reach the government's argument that the IPKCA is a valid exercise of Congress' power to regulate and protect persons or things in commerce. It is worth noting, however, that the government's argu-

ment appears to conflate the instrumentalities and the channels of commerce. Essentially, the government contends that, despite her stop in Iran, Ava was still a person in international commerce even after her physical movement by air from the United States to Iran was complete. But the government does not address the fact that when Ava stepped off the plane that brought her to Iran, she was no longer on an instrumentality of commerce. *See United States v. Miles,* 122 F.3d 235, 246 (5th Cir.1997) (defining persons in commerce as "passengers, travelers, operators, or crew members on the instrumentalities of interstate commerce"). In any event, the retention portion of the IPKCA is better viewed as legislation that removes an impediment to the use of the channels of commerce, rather than a regulation of persons in international commerce.

**25.** *Morrison* dealt with regulation of gender-motivated crimes of violence under the civil remedy provision of the Violence Against Women Act ("VAWA"), while *Lopez* found unconstitutional the Gun–Free School Zones Act, which made it a federal crime to knowingly possess a firearm in a school zone. The Supreme Court analyzed both of these statutes under the third prong of *Lopez* and found that the regulated activity did not substantially affect commerce.

spheres of federal and state authority. While this case deals with child custody—normally an area of traditional state concern—it occurs in the context of international kidnapping, a quintessentially international problem in need of a national response. *See Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 448, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979) ("Foreign commerce is pre-eminently a matter of national concern."). Congress specifically found that in these international cases, "the lack of a federal offense—and the federal criminal justice system consequences that would flow from such an offense—handicaps the pursuit of an effective remedy by the custodial, or 'left-behind,' parent." H.R.Rep. No. 103–390, at 2 (1993), *reprinted in* 1993 U.S.C.C.A.N 2419, 2420. The retention portion of the IPKCA does not constrain state power; to the contrary, it is aimed at ensuring that state custody orders are enforced and given effect.

In summary, Congress did not exceed its authority under the Commerce Clause in enacting the retention portion of the IPKCA because it removes an impediment to the use of the channels of international commerce

### IV.

Accordingly, defendant's motion to dismiss the indictment on due process and Commerce Clause grounds must be denied.

An appropriate order has issued.