19-3627-cr
<u>United States v. Houtar</u>

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2020
No. 19-3627


UNITED STATES OF AMERICA,
<u>Appellee</u>,


<u>v.</u>


MAHYOUB MOLHI MOHAMED HOUTAR, AKA MAHYOUB MOLHI MOHAMED HAUTER,
AKA MAHYOUB HAUTER,
<u>Defendant-Appellant</u>.


ARGUED: SEPTEMBER 23, 2020
DECIDED: NOVEMBER 13, 2020


Before:      JACOBS, LEVAL, BIANCO, <u>Circuit Judges</u>.

Mahyoub Molhi Mohamed Houtar appeals from the judgment of the United States District Court for the Eastern District of New York (DeArcy Hall, <u>J.</u>) convicting him of international parental kidnapping and passport fraud, and sentencing him principally to concurrent terms of 36 and 42 months' imprisonment.   On appeal, Houtar contends that the International Parental Kidnapping Crime Act ("IPKCA") is unconstitutionally vague as applied to him. He also challenges the imposition of two Sentencing Guidelines enhancements for substantial interference with the administration of justice and for fraudulent

1

use of a United States passport.   We conclude that the IPKCA is not vague as applied to Houtar and that both sentencing enhancements were applied properly.   Accordingly, we **AFFIRM** the conviction and the sentence.

_____

EUNICE C. LEE, Of Counsel, Federal Defenders of New York, Inc., Brooklyn, NY, for Defendant-Appellant Mahyoub Molhi Mohamed Houtar.

ELIZABETH MACCHIAVERNA (Jo Ann M. Navickas, on the brief), Assistant United States Attorneys, for Seth D. DuCharme, Acting United States Attorney for the Eastern District of New York, for Appellee United States of America.

DENNIS JACOBS, Circuit Judge:

Appellant Mahyoub Molhi Mohamed Houtar was convicted of international parental kidnapping and passport fraud in the following circumstances.   Houtar was married in Yemen and promptly came to the United States with his wife, where they had two daughters.   A few years later, they returned to Yemen as a family.   After a Yemeni divorce (and remarriage by the wife), they separately returned to the United States, leaving the children with his family in Yemen.   Houtar's ex-wife sought custody, and in September 2016, obtained visitation rights from the Kings County Family Court, which ordered Houtar to bring their daughters back for an extended visit with their mother.

2

Houtar defied that order.  He fled the United States, rejoined his family in Yemen, and prevented his ex-wife from seeing her daughters for the next three years.

About six months after absconding, Houtar tried to replace his U.S. passport, which he had surrendered to the Family Court.  He gave its number and issuance date to the embassy in Cairo, claiming the original had been stolen. The application evidently triggered an INTERPOL red notice, and a year later, he was arrested in Cairo and returned to this country.

Houtar was charged with: (1) two counts of international parental kidnapping, based on the unlawful retention of his two daughters in Yemen, and (2) one count of passport fraud, based on the false statements he made in the application for a replacement passport.  He pled guilty to all three counts.

On appeal, Houtar challenges the parental kidnapping conviction on the ground that the International Parental Kidnapping Crime Act ("IPKCA") is vague as applied to him.  (He does not contest the conviction for passport fraud.)  We have not previously considered whether the IPKCA is unconstitutionally vague as applied to someone who retains children abroad

3

without first abducting them, when the children had not been in the United States for several years prior to the unlawful retention.

Houtar also challenges two sentencing enhancements, one for substantial interference with the administration of justice (based on his flight) and the other for fraudulent "use" of a U.S. passport (based on his application to replace the confiscated passport). We **AFFIRM** both the conviction and the sentence.

## BACKGROUND

Houtar and his ex-wife, S.A., married in Yemen in 2006. Houtar, a naturalized American, then brought S.A. to Brooklyn, where the couple's two daughters were born in 2008 and 2010. In March 2011, S.A. took the children to Yemen for what was supposed to be an extended visit. Houtar joined them several months later. In Yemen, the marriage deteriorated, and the couple divorced in November 2014. When S.A. remarried soon after the divorce, Houtar took physical custody of the children.

At some point in 2015, Houtar travelled back to New York, leaving his daughters in Yemen with his family. Around that same time, S.A. moved back

4

to New York with her new husband. The children remained in Yemen, where they had been for the last four years.

In October 2015, S.A. filed a custody petition against Houtar in Kings County Family Court. Houtar, who first raised and then withdrew a jurisdictional challenge, was ordered to remain within the court's jurisdiction and to surrender his passport, which he did. He appeared in Family Court and testified several times. Ultimately, in September 2016, the Family Court ordered Houtar to bring his daughters back to the United States for an extended visit with their mother, who at that point had not seen them in almost two years.

Houtar did not comply with that order. Instead, he fled the country for Yemen, and a warrant was issued for his arrest. Though the girls remained with Houtar in Yemen, S.A. was awarded sole custody.

At some point after his return to Yemen, Houtar traveled to Cairo, and applied for a replacement passport at the United States embassy. In the application, Houtar provided the number and issuance date of his original passport (which remained with the Family Court in Brooklyn), and claimed that it had been stolen in Yemen.

Approximately 18 months after he left the United States, Houtar was arrested in Cairo pursuant to an INTERPOL Red Notice. A United States Air Marshal escorted him back to New York, where he was charged with two counts of international parental kidnapping, in violation of the IPKCA, 18 U.S.C. § 1204(a), and with one count of passport fraud, in violation of 18 U.S.C. § 1542. S.A. was not reunited with her daughters until May 2019, nearly three years after the Family Court ordered Houtar to return them.

After the district court denied Houtar's motion to dismiss the IPKCA charges on vagueness grounds, he pled guilty to all three counts in the indictment. At sentencing, the district court applied offense-level enhancements for: (1) threatening to cause physical injury in order to obstruct the administration of justice, (2) substantial interference with the administration of justice, and (3) fraudulent use of a United States passport. The second and third enhancements are challenged on appeal. Houtar was sentenced to 36 months on the IPKCA charges and 42 months on the passport fraud charge, to be served concurrently.

Houtar advances three arguments on appeal.   He renews his vagueness challenge to the IPKCA (Point I below).   He contests the three-level enhancement for substantial interference with the administration of justice (Point II).   Finally, he contests the four-level enhancement for fraudulent "use" of a United States passport (Point III).

## DISCUSSION

## I

Houtar contends that the IPKCA is vague as applied to him.   The Act applies if a child has "been in the United States" and was "remove[d]" or "retain[ed]" abroad with the intent to obstruct parental rights.   18 U.S.C. § 1204(a).   Houtar argues that it was unforeseeable that he would be prosecuted under the IPKCA because his children were never abducted and because they had not been present in the United States for several years before the unlawful retention began.[1]

_____

[1] Houtar suggests that there was no allegation that he ever abducted the children.   For our purposes, what matters is that there is no allegation in the indictment that he abducted the children *in the United States*; the IPKCA charges

7

The void-for-vagueness doctrine springs from the Fifth Amendment's due process clause.   A statute can be unconstitutionally vague if it either "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or is "so standardless that it authorizes or encourages seriously discriminatory enforcement."   United States v. Williams, 553 U.S. 285, 304 (2008).   Therefore, to survive a vagueness challenge, "a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."   Kolender v. Lawson, 461 U.S. 352, 357 (1983). We review constitutional challenges to statutes de novo, McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 493 (1991), but presume that acts of Congress are not unconstitutionally vague, Skilling v. United States, 561 U.S. 358, 403 (2010).

## A.   Fair Notice

When a vagueness challenge alleges lack of notice, the relevant inquiry is whether the statute "presents an ordinary person with sufficient notice of . . .

---

against Houtar relate only to his unlawful retention of the children in Yemen. There is, however, an assertion in the record that, while the family was in Yemen, Houtar took the children from S.A. at gunpoint.   See Gov. App'x at 139.

what conduct is prohibited." Thibodeau v. Portuondo, 486 F.3d 61, 67 (2d Cir. 2007). This requirement assures that statutes do not "lull the potential defendant into a false sense of security, giving him no reason even to suspect that his conduct might be within its scope." United States v. Herrera, 584 F.2d 1137, 1149 (2d Cir. 1978). "Statutes need not, however, achieve 'meticulous specificity,' which would come at the cost of 'flexibility and reasonable breadth.'" Arriaga v. Mukasey, 521 F.3d 219, 224 (2d Cir. 2008) (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)). And when, as here, a vagueness challenge is as-applied (as opposed to facial), the challenge cannot succeed if *the defendant's* conduct "is clearly proscribed by the statute." United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (en banc) (internal quotation marks omitted).

The IPKCA is a scarcely-used 1993 statute that was designed to deter parental kidnapping in instances where the Hague Convention supplies no remedy.[2] H.R. Rep. No. 103–390 at 3 (1993). Its core provision is that:

---

[2] The IPKCA addresses a perceived deficiency in the Hague Convention. H.R. Rep. No. 103–390 at 3 (1993). Because the Hague Convention applies only if "both the country to which the child is abducted and the country from which they are taken are parties to the convention," a parent could evade it by retaining the child in a "safe haven" non-signatory country. United States v. Amer, 110

> whoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both.

18 U.S.C. § 1204(a).   To establish a violation of the IPKCA, the government must prove: (1) that the child had previously been in the United States; (2) that the defendant took the child from the United States to another country or kept the child from returning to the United States from another country; and (3) that the defendant acted with the intent to obstruct the lawful exercise of another person's parental rights.   United States v. Miller, 626 F.3d 682, 688 (2d Cir. 2010). (The facts of this case create a choice-of-law puzzle concerning parental rights that is not raised by the parties.[3])

---

F.3d 873, 881–82 (2d Cir. 1997).   Recognizing this loophole, the IPKCA makes it a federal offense to remove or retain children abroad with the intent to obstruct parental rights, regardless of whether the destination country is a signatory to the Hague Convention.   H.R. Rep. No. 103–390 at 3 (1993).

[3] The IPKCA defines "parental rights" as "the right to physical custody of the child . . . whether joint or sole (and includes visiting rights) . . . whether arising by operation of law, court order, or legally binding agreement of the parties." 18 U.S.C. § 1204(b)(2).   We have interpreted this provision to mean that parental rights under the IPKCA should be determined "by reference to State law, *in accordance with the Hague Convention*."   United States v. Amer, 110 F.3d 873, 878 (2d Cir. 1997) (internal quotations omitted) (emphasis added).   The Hague

Houtar's vagueness challenge centers on the IPKCA's phrase "retains a child (who has been in the United States)." 18 U.S.C. § 1204(a). In Houtar's view, because the IPKCA fails to specify when or for how long a child must "ha[ve] been in the United States" for the statute to apply, he lacked notice that it applied to his daughters, both of whom were born in the United States but, by the time the unlawful retention began, had been outside the country for several years without ever having been abducted by anyone. At bottom, he contends that an IPKCA prosecution was unforeseeable considering the remoteness of his daughters' presence in the United States.

---

Convention defines parental rights by "the law of the State in which the child was habitually resident immediately before the removal or retention." Convention on the Civil Aspects of International Child Abduction, art. 3(a), Oct. 25, 1980, T.I.A.S. No. 11670. Here, the children were not habitually resident in the United States immediately before Houtar retained them in Yemen. Are S.A.'s rights properly determined according to Yemeni law? Although that question has possible bearing on whether Houtar violated the IPKCA, "[i]t is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." Singleton v. Wulff, 428 U.S. 106, 120 (1976). In any case, Houtar waived the right to appeal his conviction as part of his guilty plea, and would not be permitted to argue on appeal that his conduct did not violate the IPKCA. See App'x at 135. Therefore, for the purposes of this appeal, we assume that S.A. had parental rights over the two girls under the IPKCA's definition.

11

In United States v. Amer, we considered and rejected a similar vagueness challenge to the IPKCA. 110 F.3d 873 (2d Cir. 1997). The defendant in Amer abducted his three children from their Queens apartment while his wife was out shopping and then retained them in Egypt for the next six months. Id. at 877. We reasoned that because Amer had engaged in conduct that fell "squarely within the core of the IPKCA," he could not challenge it as vague as applied to him. Id. at 878. The court also explained that the disputed phrase in the IPKCA--"who has been in the United States"--was not vague as applied to Amer's three children, because each of them had resided in New York for years immediately before the abduction. Id.

Though instructive, Amer does not answer the primary question posed in Houtar's appeal: whether the IPKCA is vague as applied to someone who retained children abroad, without having abducted them, when the children had been abroad for years before their presence abroad became an unlawful retention. In short, the conduct in Amer is at "the core of the IPKCA," whereas Houtar's conduct is at a remove; so Amer cannot control the result here. Id.

12

Nonetheless, Houtar's vagueness challenge fails because the IPKCA gave him sufficient notice that his conduct was proscribed.   In an as-applied vagueness challenge, the inquiry "begins with the text of the [statute]," VIP of Berlin, LLC v. Town of Berlin, 593 F.3d 179, 187 (2d Cir. 2010), and asks "whether the [statute's] language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding," Rubin v. Garvin, 544 F.3d 461, 467 (2d Cir. 2008) (quotation marks omitted).   We therefore consult the statutory text.   As the district court observed, the IPKCA is straightforward and "written pretty broadly."   App'x at 65.   Its plain language makes it a crime to retain a child outside of the United States when that retention is done with the intent to obstruct lawful parental rights, if the retained child "has been in the United States."   See 18 U.S.C. § 1204(a); Miller, 626 F.3d at 688.

It is undisputed that Houtar retained both of his daughters in Yemen for many months with the requisite mental state.   It is also undisputed that both of his daughters had been in the United States for extended periods of time: one resided here for the first two years and seven months of her life, and the other the first five months.   The statutory text draws no distinction between a child

13

who was in the United States *immediately preceding* the unlawful retention, and a child who was not. Both children are covered by the statute. A person of ordinary intelligence who reads the IPKCA's broad but unambiguous language would have sufficient notice that the statute applied here, since both of Houtar's children had "been in the United States" for significant periods of time. See 18 U.S.C. § 1204(a); see also Amer, 110 F.3d at 878 (reasoning that "although there might be room for argument as to whether foreign children who were merely visiting the United States on a week-long vacation would be protected by the [IPKCA]," the statute plainly protected children who had spent long stretches of time in the United States).

That Houtar did not *abduct* his children from the United States does not render the IPKCA vague as applied to him, because the statute proscribes retention as well as abduction. See Miller, 626 F.3d at 688; United States v. Mobley, 971 F.3d 1187, 1204 (10th Cir. 2020) ("[W]e read § 1204 as providing three means of accomplishing 'international parental kidnapping' . . . (1) removal, (2) attempted removal, and (3) retention."); United States v. Nixon, 901 F.3d 918, 921 (7th Cir. 2018) (agreeing with the district court's conclusion

14

that, by proscribing removal, attempted removal, and retention, the IPKCA "states multiple ways of committing a single crime").

Houtar also contends that he lacked notice because "the IPKCA case law primarily has addressed [abduction], and not claims of retention alone." Appellant Br. at 37. Because our vagueness inquiry depends primarily on the text of the challenged statute, VIP of Berlin, 593 F.3d at 187, caselaw scenarios are of limited relevance. Still, even assuming Houtar consulted caselaw, not all IPKCA cases involve an abduction; so even if we were inclined to place more weight on the circumstances of past prosecutions, Houtar's challenge would still fall short. See, e.g., United States v. Shahani-Jahromi, 286 F. Supp. 2d 723, 725 (E.D. Va. 2003) (denying motion to dismiss IPKCA charges that were based solely on unlawful retention in Iran); United States v. Homaune, 898 F. Supp. 2d 153, 159 (D.D.C. 2012) (similar); United States v. Cummings, 281 F.3d 1046, 1049 (9th Cir. 2002) (affirming IPKCA conviction that was premised on unlawful retention).

Finally, Houtar asserts that the statute must be vague because, if taken at face value, the IPKCA's phrase--"has been in the United States"--would apply to

15

every child who has ever set foot in the United States, including on a minutes-long layover.   Appellant Br. at 33.   However, the vagueness issue on an as-applied challenge is not whether the statute's reach is clear in every application, but whether it is clear as applied to the defendant's conduct.   See Holder v. Humanitarian Law Project, 561 U.S. 1, 21 (2010) ("[T]he scope of the material-support statute may not be clear in every application.   But the dispositive point here is that the statutory terms are clear in their application to plaintiffs' proposed conduct, which means that plaintiffs' vagueness challenge must fail."); Williams, 553 U.S. at 305 (explaining that it is a "basic mistake" that "the mere fact that close cases can be envisioned renders a statute vague").

"[E]ven if there is ambiguity as to the margins of what conduct is prohibited under the statute," Dickerson v. Napolitano, 604 F.3d 732, 747 (2d Cir. 2010), an ordinary person would understand it to cover Houtar's children because, unlike the child in the layover hypothetical, both of them "ha[d] been in the United States" for significant periods of time, see 18 U.S.C. § 1204(a); see also United States v. Saliba, 489 Fed. App'x 501, 502 (2d Cir. 2012) (holding that the defendant's conduct was "clearly covered by the [IPKCA]" because his daughter

16

was born in Brooklyn and resided there for four months before her abduction).

Accordingly, Houtar's vagueness challenge fails insofar as it is premised on deficient notice.

**B.    Arbitrary Enforcement**

In a few instances, Houtar's brief asserts (without much accompanying analysis) that the IPKCA's broad language likewise fails to provide adequate guidance to law enforcement.   See, e.g., Appellant Br. at 33.   This arbitrary-enforcement argument is largely a corollary of the argument on lack of notice. For the sake of completeness, we address that argument as well.

A statute is void for vagueness if it has "standardless" wording that "allows policemen, prosecutors, and juries to pursue their personal predilections."   Smith v. Goguen, 415 U.S. 566, 575 (1974).   In deciding the adequacy of such guidance, a court can uphold the statute on two alternate grounds:

> (1) that [the] statute as a general matter provides sufficiently
> clear standards to eliminate the risk of arbitrary enforcement
> or (2) that, even in the absence of such standards, the conduct
> at issue falls within the core of the statute's prohibition, so
> that the enforcement before the court was not the result of the
> unfettered latitude that law enforcement officers and

> factfinders might have in other, hypothetical applications of
> the statute.

Farrell v. Burke, 449 F.3d 470, 494 (2d Cir. 2006).

Houtar's vagueness challenge is defeated by the second ground, because his conduct falls within the core of the IPKCA's prohibition on international parental kidnapping. See H.R. Rep. No. 103–390 (1993). The statute makes it a federal crime to retain abroad children who have been in the United States, if done to obstruct lawful parental rights. See 18 U.S.C. § 1204(a). Houtar retained his two young daughters abroad for years with the intent to obstruct his ex-wife's parental rights. And both of Houtar's daughters were born in the United States and spent a significant portion of their young lives here. Because Houtar's conduct falls within "the core of the statute's prohibition," we need not address whether, as a general matter, the IPKCA provides clear enforcement standards regarding when or for how long a child must have been in the United States to be covered by the statute. See Farrell, 449 F.3d at 494. The IPKCA is

18

not vague as applied to Houtar, and his international parental kidnapping conviction is affirmed.

## II

Houtar next challenges a three-level sentencing enhancement for "substantial interference with the administration of justice" that was imposed pursuant to U.S.S.G. § 2J1.2(b)(2). This challenge involves a legal interpretation of the Sentencing Guidelines and is reviewed <u>de novo</u>. <u>See</u> <u>United States v. McSherry</u>, 226 F.3d 153, 157 (2d Cir. 2000).

Substantial interference "includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2(b)(2), cmt. n.1. "[T]he term 'includes' clearly indicates that the subsequent listing of acts warranting this enhancement is not exclusive"; so other acts can also serve as the basis for this enhancement if they are "similarly or even more disruptive of the administration of justice." <u>See</u> <u>Amer</u>, 110 F.3d at 885.

19

Houtar argues that the district court imposed the enhancement because he defied the Family Court's visitation order and retained his daughters in Yemen, conduct that is identical to the conduct underlying the IPKCA charges. According to Houtar, he is thus being punished twice for the same acts.

But Houtar mischaracterizes the district court's rationale. The substantial interference enhancement was imposed for the additional reason of his flight from Brooklyn to Yemen after the visitation order issued, in defiance of the Family Court's order to remain within its jurisdiction. The district court emphasized this point at sentencing in response to the same argument Houtar advances here: Houtar "could have left the girls in Yemen, which would have been the conduct necessary for [the IPKCA counts], without fleeing the United States." App'x at 200. Since the enhancement serves to punish him for the additional conduct of flight, the substantial interference enhancement is not redundant of the IPKCA charges.

The interference was "substantial" because Houtar's flight impaired the Family Court's ability to "administer justice" by using its contempt power to coerce him into complying with its visitation order. See Amer, 110 F.3d at 885

20

(affirming the imposition of the substantial interference enhancement when the defendant fled the country with his children to avoid a custody dispute, thus "prevent[ing] proper legal proceedings from occurring"). As the district court concluded, Houtar's flight "hindered the ability of [the Family Court] . . . to realize [its] order" and administer justice. App'x at 200. We detect no error in its decision to impose the substantial interference enhancement.

## III

Houtar's final argument on appeal requires us to determine what it means to "use" a passport (fraudulently or otherwise). He challenges the applicability of U.S.S.G § 2L2.2(b)(3), which provides for a four-level enhancement if the defendant "fraudulently obtained or used [] a United States passport" in connection with an underlying offense.

Houtar posits that the plain meaning of the word "use" is to "take, hold, or deploy (something) as a means of accomplishing a purpose or achieving a result." Reply Br. at 17 n.3. And he reasons that because he did not *physically*

*present* his old passport when applying for a replacement (it remained with the Family Court), he did not "use" it. We disagree for two reasons.

First, the commentary instructs us to construe the word "use" broadly and apply the enhancement in cases involving "the attempted renewal of previously-issued passports." U.S.S.G. § 2L2.2(b)(3), cmt. n.3. "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993). The commentary's instruction to construe the word "use" broadly provides interpretative guidance that is neither inconsistent with the guideline, nor a plainly erroneous reading of it. Therefore, we must follow the commentary's direction and construe the term broadly. See id. Moreover, the facts of Houtar's case are analogous to an example from the note: the "attempted renewal of previously-issued passports." U.S.S.G. § 2L2.2(b)(3), cmt. n.3. Though Houtar applied for a replacement, not a renewal, we see no salient difference that would make the enhancement less applicable here.

Second, Houtar's physical presentment requirement would conflict with the common meaning of the word "use," which, per his own definition, means to "deploy something." Reply Br. at 17 n.3. In Houtar's fraudulent application to replace his passport, he "deployed" or "used" his old one by giving its number and its issuance date--just as one "uses" someone else's credit card by inputting its number and expiry date to make a fraudulent purchase over the Internet. He did not have the passport in hand when he used it to seek a new one, but used it nevertheless, much as the authorities used it to detect his fraud.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.